IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| STEVEN WAYNE HALL, JR., | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-00731-CG-C |
| | ) | |
| KIM THOMAS, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

Petitioner, Steven Wayne Hall, Jr., (hereinafter referred to as "Hall" or "Petitioner") initiated this action on October 10, 2007, by filing a Petition for Writ of Habeas Corpus (the "Petition") (Doc. 1) pursuant to 28 U.S.C. § 2254. Hall challenges a 1993 state court judgment of conviction for one count of capital murder committed during a burglary in violation of Ala. Code § 13A-4-40(a)(4) (1975), entered in the Circuit Court of Monroe County, Alabama, for which he was sentenced to death. Id. This matter is before the court on Hall's Petition (Doc. 1), the respondent, Kim Thomas' (hereinafter referred to as "Thomas" or "Respondent") response (Doc. 13), and Hall's reply brief (Doc. 33). Upon consideration of all matters presented, and for the reasons stated below, this court finds that Hall's Petition is due to be **GRANTED**.

# I.   FACTUAL AND PROCEDURAL BACKGROUND

## A.   TRIAL

Upon an extensive review of the record, the court finds that the underlying facts were succinctly stated upon Hall's direct appeal by the Alabama Court of Criminal Appeals in Hall v. State, 820 So.2d 113 (Ala.Crim.App. 1999):

> The appellant, Steven Wayne Hall, Jr., was indicted by a Conecuh County grand jury for murder made capital because the murder was committed during the course of a burglary.  See § 13A–5–40(a)(4), Ala.Code 1975.  After Hall's codefendant, Wayne Holleman Travis, was tried and convicted of capital murder in Conecuh County, Hall moved for a change of venue based on what he says was the excessive publicity surrounding Travis's trial.  The motion was granted and Hall's case was transferred to Monroe County.  Hall was tried and convicted [on August 13, 1993] by a Monroe County jury for the offense charged in the indictment.  The jury, by a vote of 10–2, recommended that Hall be sentenced to death.  The trial court accepted the jury's recommendation and [on September 9, 1993] sentenced Hall to death by electrocution.
>
> The State's evidence tended to show that on December 15, 1991, Conecuh County sheriff deputies discovered the body of 69–year–old Clarene Haskew on the kitchen floor of her home in McKenzie.  Haskew had been shot twice in the back of the head, severely beaten, and strangled.  A neighbor telephoned Haskew's son after she went to Haskew's home and discovered that the telephone line had been cut and that the glass on the entry door had been broken.  Dr. Gregory Price Wanger, a forensic pathologist employed by the Alabama Department of Forensic Sciences, testified that Haskew was alive when she was shot and when the blunt force injuries were inflicted; thus, it was impossible for him to conclude which injuries occurred first.
>
> When her body was discovered, Haskew's home was in total disarray and a pentagram had been spray-painted on the kitchen cabinets.  The words "Thunder Struck" were also spray-painted on the kitchen floor near Haskew's body.  Silverware and an address book had been taken from the scene and Haskew's gray 1982 Ford LTD automobile was missing.  A be-on-the-lookout ("BOLO") was issued for the car.
>
> On the day of the murder, Nellie Schad's home, which was about one-fourth mile from Haskew's home, was burglarized.  A .38 caliber Rossi revolver and a .410 gauge shotgun were taken in the burglary.  Forensic analysis matched one bullet removed from Haskew's body with the .38 caliber gun stolen from Schad's home on the day of the murder.

As a result of the BOLO, police received information that the stolen automobile was parked outside Paula Shiver's house in Uriah. Paula Shiver was Hall's girlfriend. When deputies arrived at Shiver's residence they saw a Ford automobile matching the description of Haskew's stolen vehicle in Shiver's yard. One of the deputies approached the vehicle to verify from the license plate that the vehicle was Haskew's vehicle. After they verified that it was Haskew's car, the deputies knocked on Shiver's door. Paula Shiver answered the door and told the deputies that Hall and Travis were in the house. While Shiver talked with the deputies, Hall and Travis fled on foot.

The dog warden from Fountain Prison was called to assist in apprehending Hall and Travis. Dogs tracked the two to the Rocky Hill community. When they found Hall and Travis, deputies attempted to get them to surrender. After deputies fired gunshots into the air, both suspects used profanity; one of the two suspects yelled, "if it's going to be a shoot out, a shoot out it will be." Deputies then shot in the direction of the suspects, wounding both Hall and Travis. Hall was shot in the upper thigh. While waiting for an ambulance, deputies searched Hall and recovered seven rounds of .38 caliber ammunition in Hall's front vest pockets. These bullets fit one of the guns stolen from Schad's house—the gun that was identified as the murder weapon. The deputies' search of Travis revealed that Travis had the keys to the stolen Ford in his possession. Also, numerous items stolen from Haskew's and Schad's houses were discovered in the Ford. The murder weapon was [also] discovered in the Ford.

Hall conceded at trial and at oral argument before [the Court of Criminal Appeals] that he participated in the burglary of Haskew's house. His defense was that he did not know that Travis intended to kill Haskew.

## B.    DIRECT APPEAL

Hall pursued a direct appeal to the Alabama Court of Criminal Appeals. In his direct appeal, Hall raised 19 issues (and multiple sub-issues) which included a Batson claim arguing that the prosecutor's race-neutral reasons for striking black members of the venire were not valid.[1]  (Direct Appeal Record, Vol. 49, Tab R-40, pp. 1-22). The Alabama Court of Criminal Appeals affirmed Hall's conviction in an opinion issued on October 1, 1999. Hall v. State, 820 So.2d 113 (Ala.Crim.App.

---

[1] Petitioner Hall is white. Hall's co-defendant, Wayne Travis, is also white. Their victim, Clarene Haskew, was also white.

3

1999). In its opinion, the court examined the prosecutor's race-neutral reasons, i.e., that he struck black jurors because of their views on the death penalty, and found that "[t]here is no evidence that the reasons advanced by the prosecutor were a sham, nor is there evidence of disparate treatment between prospective black jurors and prospective white jurors." Hall, 820 So.2d at 131. The Court of Criminal Appeals denied Hall's application for rehearing on November 12, 1999. Id. at 113. The Supreme Court of Alabama thereafter affirmed the conviction on June 1, 2001, finding that the Court of Criminal Appeals thoroughly addressed and properly decided many of the issues Hall raised in his petition for certiorari. Hall v. State, 820 So.2d 152, 157 (Ala. 2001). The Alabama Supreme Court also found that 16 issues in Hall's petition for certiorari were not raised in the trial court or in the Court of Criminal Appeals, and applied a plain error standard of review to those 16 claims before finding that none of them had merit. Id. at 153. The United States Supreme Court denied Hall's petition for a writ of certiorari on May 20, 2002, in Hall v. Alabama, 535 U.S. 1080 (2002).

C.      RULE 32 PETITION/COLLATERAL APPEAL

Hall next filed a petition for post-conviction relief pursuant to Alabama Rule of Criminal Procedure 32 (the "Rule 32 petition") with the Circuit Court of Monroe County on April 1, 2003, and subsequently filed an amended Rule 32 petition on May 28, 2004. In his amended Rule 32 petition, Hall again raised a Batson claim, arguing specifically that "the prosecution's elimination of qualified jurors on the basis of race denied Mr. Hall a fair trial." (Collateral Appeal Record, Vol. 54, Tab R-

62, p. 67).  After holding an evidentiary hearing on August 15, 2005, the Circuit
Court denied Hall's amended Rule 32 petition on November 4, 2005.  In regards to
Hall's <u>Batson</u> claim, the Circuit Court found that "the claim that the prosecution's
alleged elimination of qualified venire members on the basis of race violated
petitioner Hall's right to a fair trial" was procedurally barred from review under
Rule 32.2(a)(2) of the Alabama Rules of Criminal Procedure because they were
raised or addressed at trial.  <u>Steven Wayne Hall, Jr. v. State of Alabama</u>, No. CC-
93-87.60, slip op. at pp. 9-10 (Monroe County Circuit Court, Nov. 4, 2005).  The
judge also ruled that Hall's <u>Batson</u> claim was procedurally defaulted under Rule
32.2(a)(4) of the Alabama Rules of Criminal Procedure because it was "raised or
addressed on [direct] appeal."  <u>Id.</u>

Hall appealed the denial of his Rule 32 petition to the Alabama Court of
Criminal Appeals, which affirmed the decision of the Circuit Court on March 23,
2007.  <u>See</u> <u>Hall v. State</u>, 979 So.2d 125 (Ala.Crim.App. 2007).  The Court of
Criminal Appeals agreed with the Circuit Court that Hall's <u>Batson</u> claim was
procedurally barred, and determined that it "need not address the propriety of the
circuit court's finding that the claims were precluded …"  <u>Hall v. State</u>, 979 So.2d at
177.

Following the decision of the Court of Criminal Appeals, Hall filed a petition
for a writ of certiorari with the Alabama Supreme Court, which was denied without
rationale on August 24, 2007.  <u>Ex parte Hall</u>, 979 So.2d 125, <u>certiorari  denied</u> (Ala.
Aug. 24, 2007).

5

D.    §2254 FEDERAL HABEAS PETITION

Hall then filed a 28 U.S.C. § 2254 federal habeas petition in this federal

district court for the Southern District of Alabama on October 10, 2007.  (Doc. 1).

The respondent filed a response on February 4, 2008 (Doc. 13), to which Hall filed a

reply brief on May 26, 2009 (Doc. 33).  On September 22, 2011, respondent filed a

motion for timely ruling (Doc. 34).

## II.    STATEMENT OF THE LAW

A.    THE ANTI-TERRORISM AND EFFECTIVE DEATH PENALTY ACT
OF 1996

Section 2254(a) of Title 28 of the United States Code provides that "a district court

shall entertain an application for a writ of habeas corpus in behalf of a person in custody

pursuant to the judgment of a State court" upon a showing that his custody is in violation

of the Constitution or laws of the United States.  28 U.S.C. §2254(a).  As the instant

petition was filed after April 24, 1996, it is subject to the more deferential standard for

habeas review of state court decisions under § 2254 as brought about by the Anti-

Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Pub.L 104-132, § 104,

110 Stat. 1214, 1218-1219.  "Under AEDPA the role of the federal courts … is strictly

limited."  Jones v. Walker, 496 F.3d 1216, 1226 (11th Cir. 2007).  This court no longer has

"plenary authority to grant habeas relief" but rather, this court's "authority to grant relief

is now conditioned on giving deference to the states."  Id.  Specifically, § 2254(d) provides

in relevant part:

> (d) An application for a writ of habeas corpus on behalf of
> a person in custody pursuant to the judgment of a State
> court shall not be granted with respect to any claim that

was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The United States Supreme Court has stated that this court must first determine whether the AEDPA is satisfied, and only then may this court review the petitioner's constitutional claims "without the deference AEDPA otherwise requires." Panetti v. Quarterman, 551 U.S. 930, 932 (2007); see also Jones, 496 F.3d at 1228.

### (1)      § 2254(d)(1)

The United States Supreme Court ("U.S. Supreme Court") explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362 (2000).  Justice O'Connor maintained that "§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court."  In other words, "[u]nder § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied – the state-court adjudication resulted in a decision that (1)

was contrary to … clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) involved an unreasonable application of … clearly established Federal law, as determined by the Supreme Court of the United States." Williams, 529 U.S. at 412-13 (O'Connor, concurring). First, "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." Second, "[u]nder the 'reasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413 (internal citations omitted); see also Ramdass v. Angelone, 530 U.S. 156, 165-166 (2000) ("A state determination may be set aside under this standard if, under clearly established federal law, the state court was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled.")

In applying this test, the U.S. Supreme Court has instructed that, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the U.S. Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003); (citing Williams, 529 U.S. at 412). The law is "clearly established" if U.S. Supreme Court

precedent at the time "would have compelled a particular result in the case."
Neeley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998) overruled on other grounds by
Parker v. Head, 244 F.3d 831, 835 (11th Cir. 2001).

In the second step, the court must determine whether the State court
adjudication is contrary to the clearly established U.S. Supreme Court case law,
either because " 'the state court applies a rule that contradicts the governing law set
forth in [the U.S. Supreme Court's] cases' or if 'the state court confronts a set of
facts that are materially indistinguishable from a decision of [the U.S. Supreme
Court] and nevertheless arrives at a result different from [U.S. Supreme Court]
precedent.' " Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405-06).  The
U.S. Supreme Court later clarified that "[a]voiding these pitfalls does not require
citation of our cases – indeed, it does not even require awareness of our cases, so
long as neither the reasoning nor the result of the state-court decision contradicts
them."  Early v. Parker, 537 U.S. 3, 8 (2002).  "If the State court decision is found in
either respect to be contrary, the district court must independently consider the
merits of the petitioner's claim."  Williams v. McNeil, slip op., 2010 WL 144986 at *5
(N.D. Fla. Jan. 7, 2010).

If, on the other hand, this court first concludes that the state court applied
the correct Supreme Court precedent and, second, finds that the facts of the
Supreme Court cases and the petitioner's case are materially distinguishable, this
court must go to the third step and determine whether the state court
"unreasonably applied" the governing legal principles set forth in the Supreme

Court's cases.  See 28 U.S.C. § 2254(d)(1).  The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409.  Whether a state court's decision was an unreasonable application of legal principle "must be assessed in light of the record the court had before it." Holland v. Jackson, 542 U.S. 649, 652 (2004) (per curiam) (citations omitted); c.f. Bell v. Cone, 535 U.S. 685, 697 n.4 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from the Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). It is important to note that "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); see also Williams, 529 U.S. at 412 ("an unreasonable application of federal law is different from an *incorrect* or *erroneous* application of federal law.").

### (2)     § 2254(d)(2)

Besides obtaining relief under § 2254(d)(1), a petitioner may also receive federal habeas relief from a claim adjudicated on the merits in state court where

that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 785 (2011).  In regards to this subsection, the Supreme Court has provided that "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding." Miller-El v. Cockrell ("Miller-El I"), 537 U.S. 322, 348 (2003).

When performing a review under § 2254(d)(2), a federal court presumes the state court's factual finding to be sound unless the petitioner rebuts the "presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see Miller-El I, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding, and when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence."); Jones, 496 F.2d at 1226-1227 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that the standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

### B.    PROCEDURAL DEFAULT

As stated above, only if this court finds that Hall satisfied the AEDPA and § 2254(d), does this court take the final step of conducting an independent review of

11

the merits of petitioner's claims.  See Panetti, 127 S. Ct. at 2858-2859; Jones, 469 F.3d at 1228.  Also of critical importance to the § 2254 analysis are notions of procedural default and exhaustion.  "A state court's rejection of a petitioner's [federal] constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim."  Borden v. Allen, 646 F.3d 785, 808 (11th Cir. 2011) (citation omitted); Conner v. Hall, 645 F.3d 1277, 1287 (11th Cir. 2011) ("[u]nder the doctrine of procedural default, a federal habeas court will not review a claim rejected by a state court if the decision of [the state] court rests on a state law ground that that is independent of the federal question and adequate to support the judgment")(quotation marks and citation omitted).  "[A] habeas petitioner may overcome a procedural default if he can show adequate cause and actual prejudice, or, alternatively, if the failure to consider the merits of his claim would result in a fundamental miscarriage of justice."  Borden, 646 F.3d at 808 n.26; see also Conner, 645 at 1287 (to overcome procedural default, petitioner must "show cause for the failure to properly present the claim and actual prejudice, or that the failure to consider the claim would result in a fundamental miscarriage of justice.").

Section 2254 also generally requires petitioners to exhaust all available state-law remedies.  In that regard, "[a] petitioner must alert state courts to any federal claims to allow the state courts an opportunity to review and correct the claimed violations of his federal rights … Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal

constitutional issues." <u>Lamarca v. Secretary, Dep't of Corrections</u>, 568 F.3d 929, 936 (11th Cir. 2009) (citations omitted).  For exhaustion purposes, it is not sufficient "that a somewhat similar state-law claim was made." <u>Kelley v. Secretary, Dep't of Corrections</u>, 377 F.3d 1317, 1344-45 (11th Cir. 2004).  What is necessary is that "the petitioner must fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." <u>Powell v. Allen</u>, 602 F.3d 1263, 1269 (11th Cir. 2010) (citation and internal marks omitted).

Before a federal court considers a habeas petition presented by a state prisoner, the court must first determine whether the petitioner has properly presented the issues to the state courts.  A state prisoner "must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 842 (1999). See also 28 U.S.C. § 2254(b)(1) (a prisoner in state custody shall not be granted a writ of habeas corpus unless the prisoner "has exhausted the remedies available in the courts of the State.").  The exhaustion doctrine requires that a petitioner "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." <u>O'Sullivan</u>, 526 U.S. at 845.  In Alabama, the established appellate review process includes an appeal to the Alabama Court of Criminal Appeals, an application for rehearing to the Alabama Court of Criminal Appeals, and an application for discretionary review by the Alabama Supreme Court.  <u>See</u> Ala.R.App. P. 4, 39–40.

A state prisoner's failure to present his claims to the state courts in the proper manner results in a procedural default of those claims.  O'Sullivan, 526 U.S. at 848.  The doctrine of procedural default, as it relates to petitions filed under 28 U.S.C. § 2254, arises from principles of comity and federalism.  Francis v. Henderson, 425 U.S. 536, 541 (1976).  A federal court "will not consider an issue of federal law on direct review from a judgment of a state court if that judgment rests on a state-law ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision."  Harris v. Reed, 489 U.S. 255, 260 (1989).  A violation of a state procedural rule is adequate to foreclose federal review if the rule is "firmly established and regularly followed."  Lee v. Kemna, 534 U.S. 362, 376 (2002).  A state court's decision is independent unless the resolution of the state law issue depends on a federal constitutional ruling.  Stewart v. Smith, 536 U.S. 856, 860 (2002).

Procedural default can arise in two ways.  First, procedural default can occur when a petitioner raises his federal claims in state court, and "the state court correctly applies a procedural default principle of state law to arrive at the conclusion that the petitioner's federal claims are barred."  Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999).  Second, procedural default can occur when a petitioner fails to raise his federal claims in state court, rendering the claims unexhausted, and the time to do so has lapsed.  Id.  See also O'Sullivan, 526 U.S. at 843–45.  Although unexhausted claims generally must be returned to the state court for consideration on the merits, if the federal court determines that the state

14

procedural rules now preclude review of the claim on the merits and, thus, exhaustion would be futile, the doctrine of procedural default applies even though the state court never invoked the state procedural rule. Snowden v. Singletary, 135 F.3d 732, 736 (11th Cir. 1998).

Once a federal claim is procedurally defaulted in state court, a state habeas petitioner "is procedurally barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default." Bailey, 172 F.3d at 1302 (citing Wainwright v. Sykes, 433 U.S. 72, 87 (1977)). "[C]ause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule" or that the procedural default was the result of ineffective assistance of counsel. Murray v. Carrier, 477 U.S. 478, 488 (1986). Prejudice, in this context, means a reasonable probability that the outcome would have been different. Jenkins v. Bullard, 210 Fed. Appx. 895, 898–901 (11th Cir. 2006) (per curiam). A petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original). In the absence of a showing of cause and prejudice, the court may yet consider a procedurally defaulted claim if a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent ..." Smith v. Murray, 477 U.S. 527, 537–38 (1986). Absent one of these exceptions, however, procedurally

defaulted claims cannot be raised in federal habeas corpus petitions. <u>Kelley</u>, 377

F.3d at 1343–45 (11th Cir. 2004).

### III.   ISSUES RAISED IN THE PETITION FOR HABEAS CORPUS

### A.   REVIEW OF PETITIONER'S CLAIMS ON THE MERITS

**CLAIM #1:**  **HALL'S <u>BATSON</u> CLAIM BASED ON EVIDENCE AVAILABLE
AT TRIAL AND DIRECT APPEAL**

In his habeas corpus petition, Hall first raises a claim for relief based on

<u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  Hall argues that the State exercised its

peremptory strikes to remove blacks from the jury venire in a racially

discriminatory manner, and advanced pretextual reasons which were not supported

by the record.  (Doc. 1, p. 10).  Hall points out that the prosecutor used nine out of

14 peremptory strikes against black members of the venire.  <u>Id.</u> at 12.

### (1)   SUMMARY OF STATE COURT DECISIONS AT TRIAL

At the close of voir dire, Hall filed a <u>Batson</u> motion, arguing that the

prosecution had engaged in unlawful racial discrimination in the use of its

peremptory strikes of black jurors.  (Trial Transcript, Vol. 42, p. 7214).  The trial

court found that Hall made a <u>prima facie</u> showing pursuant to <u>Ex Parte Branch</u>, 526

So. 2d 609 (Ala. 1987), (<u>id.</u> at 7220), and accordingly, the prosecutor articulated his

reasons for each of his peremptory strikes on the record.  (<u>Id.</u> at 7221-37).

Specifically, the prosecutor explained that he struck five black venire members

because of their opposition to the death penalty, which is a race-neutral reason.

(Id.)  The prosecutor also cited race-neutral concerns regarding a sixth black venire member who was struck because he indicated that he did not want to serve due to his poor health.[2]  (Id. at 7236).

Hall challenged the prosecutor's reasons with regard to black venire persons Minnie Lett and Mary Cunningham, both of whom the prosecution asserted it struck because they were opposed to the death penalty.[3]  (Id.)  Defense counsel argued that Lett's juror questionnaire clearly indicated that she was in favor of the death penalty, and argued further that in her voir dire testimony "she was not unequivocal in her ability to carry out her duties as a juror in this case."[4]  (Trial Transcript Vol. 42, p. 7239).  The trial court nevertheless denied the motion, finding that the reasons advanced by the prosecutor were not pretextual and did not violate Batson.  (Id. at 7241).  The trial court offered no explanation for its decision. (Id.)

---

[2]  The above discussion totals only six peremptory strikes.  This is because, although Hall repeatedly made passing references to nine of 14 black venire members being struck from the jury in his appeals briefs, he only argued pretext as to six of the prosecutor's nine peremptory strikes in his direct appeal, Rule 32 appeal, and habeas corpus petition (Doc. 1). Accordingly, Hall cannot be said to have exhausted the remedies available in the state courts with regard to these three remaining peremptory strikes, as required by § 2254(b)(1)(A).

[3]  The Court of Criminal Appeals found that Hall only challenged the prosecutor's reasons for striking Lett in his Batson motion before the trial court. See Hall v. State, 820 So.2d 113, 129 (Ala.Crim.App. 1999).  However, upon review of the trial transcript, it appears that defense counsel also challenged the prosecutor's stated reason for striking Cunningham (See Trial Transcript Vol. 42, p. 7238).  Therefore, the plain-error standard of review was not the appropriate standard of review for Hall's argument regarding Cunningham.

[4]  Although defense counsel used the phrase "not unequivocal," (Trial Transcript Vol. 42, p. 7239), it is nevertheless clear to this court from the nature of the arguments being made that the crux of defense counsel's argument to the trial court was that Lett's answer was unambiguous, and that he misspoke by saying "she was *not un*equivocal." Defense counsel presumably intended to say either "she was *not equivocal*" or "she was *unequivocal*" about her ability to carry out her duties as a juror.

(2)      SUMMARY OF STATE COURT DECISIONS ON DIRECT APPEAL

On direct appeal, the Alabama Court of Criminal Appeals considered and rejected each of six arguments posited by Hall, one for each black veniremember struck.   Hall repeated his charge that the prosecutor's proffered reason for striking Lett – that she had reservations about imposing the death penalty – was pretextual because Lett indicated on her juror questionnaire that she was in favor of the death penalty, thus "flatly contradict[ing]" the prosecutor's proffered reason. (Hall's Direct Appeal Brief, Vol. 49, Tab R-40, p. 9).  Hall also pointed to the fact that Lett stated at voir dire that she could listen to all the evidence and base her decision on that evidence.  (Id. , citing Trial Transcript, Vol. 33, pp. 5414-5415).

The Court of Criminal Appeals reviewed Lett's juror questionnaire and noted that it did indeed indicate that she marked "strongly agree" with the statement, "any person who kills another should get the death penalty."  Hall, 820 So.2d at 129.  However, the court determined from the voir dire exchange between the prosecutor and Lett that the record supported the notion that Lett had mixed feelings about the death penalty, and therefore no Batson violation existed. (Id. at 130).

The Court of Criminal Appeals then addressed Hall's Batson claim regarding the remaining four venirepersons, but applied a "plain error" standard of review because Hall did not object at trial to the prosecutor's reasons for striking them. Hall, 820 So.2d at 129-130.  Hall claimed that black venirepersons Rosa Shoemack, Jaqueline Mobley, David Williams, and Mary Cunningham each gave responses

during voir dire that clearly reflected that they could and would impose the death penalty in some cases, while the prosecutor claimed to have struck them from the jury because they had strong reservations about the death penalty, or did not indicate a willingness to impose the death penalty. (Hall Direct Appeal Brief, Vol. 49, Tab R-40, p. 12-22).

After reviewing the voir dire transcript, the court noted that veniremembers Shoemack, Mobley, Williams, and Cunningham had clearly indicated their opposition to, or strong reservations regarding, the death penalty, and were struck for that reason. Hall, 820 So.2d at 130-131. For example, as to Shoemack, the Alabama Court of Criminal Appeals noted that when asked at voir dire by the prosecutor "…could you ever vote for the death penalty, you think?" Shoemack replied "I don't think so." (Id. at 130). As to Mobley, the court of appeals noted her statements at voir dire to the effect that "I have a very open mind, I have to think – But, I do oppose it [the death penalty], Your Honor." (Id. at 131). The appeals court also noted that Mobley confirmed that her opposition to the death penalty was based upon religious conviction. (Id. at 131). As to Williams, the court of appeals noted that he appeared to confirm a preference stated in his questionnaire for imposing a sentence of life in prison without parole rather than imposing the death penalty. (Id. at 131). As to Cunningham, the Court of Criminal Appeals noted that when asked whether she would refuse to impose the death penalty "regardless" of the case, Cunningham answered "I just don't agree with killing, I mean, the death penalty. Everybody should be punished some kind of way, but, I don't go with

19

taking another life." (Id. at 130).  And finally, as to Lewis, the court of appeals noted that Lewis told the court at voir dire that he had been sick for some time with hypertension and heart disease and would like to be excused from service, rendering the prosecutor's strike permissible under Batson.  (Id. at 131).

Hall also argued that the prosecutor questioned black venire members differently than he did white venire members, focusing to a greater degree on questions regarding the death penalty.  (Hall Direct Appeal Brief, Vol. 49, Tab R-40, p. 4).  Hall asserted that the prosecutor's questions were "intended solely to elicit information which could later be used to validate the pretextual removal [of] blacks from the venire."  (Id.)  Hall pointed to the voir dire of panels two and eleven, where he accused the prosecutor of questioning only the black venire members about their views on the death penalty. (Id.)  Ultimately, however, the Alabama Court of Criminal Appeals found no evidence of disparate treatment between prospective black jurors and prospective white jurors.  Hall, 820 So.2d at 132.

For all of these reasons, the Alabama Court of Criminal Appeals denied Hall's argument on direct appeal and affirmed his conviction and sentence.

**(3)   FEDERAL REVIEW OF THE STATE COURT DECISIONS ON DIRECT APPEAL**

"The evaluation of a prosecutor's race-neutral explanations under Batson is a 'pure issue of fact … peculiarly within a trial judge's province.' " McGahee v. Ala. Dept. of Corrections, 560 F.3d 1252, 1255 (11th Cir. 2009) (quoting McNair v. Campbell, 416 F.3d 1291, 1310 (11th Cir. 2005)).  Hence, "a Batson claim at habeas is often analyzed under AEDPA § 2254(d)(2), and is only granted 'if it was

20

unreasonable to credit the prosecutor's race-neutral explanations.' " Id. (quoting Rice v. Collins, 546 U.S. 333, 338 (2006)).  However, "[w]here the concern is that a state court failed to follow Batson's three steps, the analysis should be under AEDPA § 2254(d)(1) …" Id. at 1256.  As stated above, under § 2254(d)(1), this court may only issue a writ of habeas corpus "if one of the following two conditions is satisfied – the state court adjudication resulted in a decision that (1) 'was contrary to … clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of … clearly established Federal law, as determined by the Supreme Court of the United States.' " Williams, 529 U.S. at 412-413 (O'Connor, J., concurring).

<p align="center">(a)    ANALYSIS UNDER § 2254(d)(1)</p>

<p align="center">Step 1:    Clearly Established Supreme Court Case Law</p>

In the test under § 2254(d)(1), the Supreme Court has instructed that the first step on any issue raised in a federal habeas petition, upon which there has been an adjudication on the merits in a formal state court proceeding, is that the federal court should first ascertain "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." Lockyer, 538 U.S. at 71-72.  As stated above, the law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." Neelley, 138 F.3d at 923.

The governing legal principles at the time of the direct appeal were Batson v. Kentucky, 476 U.S. 79 (1986), and Powers v. Ohio, 499 U.S. 400 (1991).  In Batson,

<p align="center">21</p>

the Supreme Court held that it was unconstitutional for the prosecution to challenge potential jurors based solely upon their race or on the assumption that because of their race, they should be unable to consider the case impartially. Batson, 476 U.S. at 89.  In Powers, the Supreme Court held that "a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race."  Powers at 415.  Furthermore, the Powers Court held that "[t]o bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service," and "… to say that the race of the defendant may be relevant to discerning bias in some cases does not mean that it will be a factor in others …" Id. at 416.  Therefore, a defendant may raise the necessary inference of "purposeful discrimination in selection of the petit jury" based "solely on evidence concerning the prosecutor's exercise of peremptory challenges " during the trial.  Batson at 96.

Once the defendant makes a prima facie showing, the burden shifts to the State to explain, in clear and reasonably specific terms, the legitimate race-neutral reasons for striking the jurors in question.  Id. at 97, 98 n.20.

Finally, the court must determine whether the defendant has established purposeful discrimination.  Id. at 98.  "The reasons stated by the prosecutor provide the only reasons on which the prosecutor's credibility is to be judged."  Parker v. Allen, 565 F.3d 1258, 1271 (11th Cir. 2009) (citing United States v. Houston, 456 F.3d 1328, 1335 (11th Cir. 2006)).  "The credibility of the prosecution's explanation

is to be evaluated considering the 'totality of the relevant facts,' including whether members of a race were disproportionately excluded."  Id. (quoting Hernandez v. New York, 500 U.S. 352, 363 (1991)).  "Questions arise regarding the credibility of the explanation and the possibility that the explanation is pretextual (1) when the prosecutor's explanation for a strike is equally applicable to jurors of a different race who have not been stricken; (2) upon a comparative analysis of the jurors struck and those who remained, including the attributes of the white and black venire members; (3) or when the prosecution fails to engage in a meaningful voir dire examination on a subject that it alleges it is concerned."  Id. (internal citations omitted).  As stated above, "[t]he evaluation of a prosecutor's race-neutral explanations under Batson is a 'pure issue of fact … peculiarly within a trial judge's province.' "  McGahee, 560 F.3d at 1255 (quoting McNair, 416 F.3d at 1310).

### Step 2: Whether the State Court's Adjudication Is Contrary to Clearly Established Supreme Court Case Law

Having determined that Batson and Powers were the governing legal principles at the time of trial and direct appeal, this court must next determine whether the state court adjudication was contrary to that clearly established Supreme Court case law, either because " 'the state court applie[d] a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or 'the state court confront[ed] a set of facts that [were] materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrive[d] at a result different from [Supreme Court] precedent.' "  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405-406).  The trial court found that Hall established a prima facie case of

discriminatory jury selection.  See Hall, 820 So.2d at 128; and Trial Transcript Vol. 42, p. 7220.  The prosecutor was then asked by the trial court to provide his race-neutral reasons for striking the black jurors.  (Trial Transcript Vol. 42, p. 7220).  When the prosecutor provided his reasons, the trial court allowed defense counsel to rebut those reasons, which he did with respect to venirepersons Minnie Lett and Mary Cunningham.  (Id. at 7238).  The trial court then found that "[the] Prosecution's reasons for striking jurors were not a pretext and that the dictates of Ex parte Branch and Batson have not been violated in this case …"  (Id. at 7241).  On direct appeal, the appellate court analyzed the reasons given by the prosecutor under both Batson and state law as it stood at that time and concluded that "[t]here is no evidence that the reasons advanced by the prosecutor were a sham, nor is there evidence of disparate treatment between prospective black jurors and prospective white jurors."  Hall, 820 So.2d at 131.

Therefore, this court finds that the state courts' adjudications at trial and on direct appeal were not contrary to clearly established Supreme Court case law since the state courts applied Batson and there were no Supreme Court cases at that time which were factually materially indistinguishable.

### Step 3: Whether the State Court "Unreasonably Applied" Batson

Since the state court applied the correct Supreme Court precedent, and the pertinent facts of Supreme Court cases and the petitioner's case are not materially distinguishable, this court must go to the third step and determine whether the state court "unreasonably applied" the governing legal principles set forth in the

Supreme Court's cases.  See 28 U.S.C. § 2254(d)(1).  The standard for an

unreasonable application inquiry is "whether the state court's application of clearly

established federal law was objectively unreasonable."  Williams, 529 U.S. at 409.

As stated above, whether a state court's decision was an unreasonable application of

legal principle "must be assessed in light of the record the court had before it."

Holland, 542 U.S. at 652.

        This court finds that the state appellate court's decision was an objectively

unreasonable application of clear federal law because the appellate court did not

extend the principles of the third step of Batson to the facts and arguments at hand.

Here, there is no question that the trial court found that Hall had shown a prima

facie case of discriminatory motive and the prosecutor had provided race-neutral

reasons for striking the black venire members.  The Alabama Court of Criminal

Appeals appeared to hedge somewhat on this question, noting that "… the trial

court could have lawfully found that no prima facie case of discrimination had been

proven if Hall made no further argument on his Batson objection."  Hall, 820 So.2d

at 128.  Nevertheless, Hall did make further argument on his Batson objection, and

the Court of Criminal Appeals did evaluate the prosecutor's reasons to determine if

there was a Batson violation.  Id.  That adjudication by the Court of Criminal

Appeals failed to follow clearly established law when it did not consider "all relevant

circumstances" in its analysis of the trial court's ruling.  Batson is quite clear that

"[i]n deciding whether the defendant has made the requisite showing, the trial court

should consider *all relevant circumstances*." <u>Batson</u>, 476 U.S. at 96. (emphasis added).

The failure to consider all relevant circumstances is as follows: in its adjudication, the Alabama Court of Criminal Appeals analyzed each of the State's explanations for striking black potential jurors and found that each reason was a legally acceptable race-neutral reason for exercising a peremptory strike.  The court ultimately found that "[t]here [was] no evidence that the reasons advanced by the prosecutor were a sham, nor [was] there evidence of disparate treatment between prospective black jurors and prospective white jurors."  <u>Hall</u>, 820 So.2d at 131.

However, neither the trial judge nor the Court of Criminal Appeals addressed a crucial argument raised by Hall, namely, that the prosecutor's stated reasons for striking Minnie Lett were at odds with the record evidence.  The prosecutor stated that he struck Lett because "[s]he, in questioning, direct questioning, had strong reservations about the death penalty …" and because Lett's questionnaire "indicated that [she] had a strong resistance to the death penalty."  (Trial Transcript Vol. 42, pp. 7232-7233).  But defense counsel argued to the trial court that "… I would simply ask the Court to look at the questionnaires," pointing out that in Lett's  juror questionnaire, "[she] stated that she strongly agreed that any person who intentionally kills another should get the death penalty; since they took a life."  (<u>Id.</u> at 7238-7239).  Hall also pointed out that Lett unambiguously stated in voir dire that she could carry out her duties as a juror in the case.  (<u>Id.</u>)

26

In fact, in her juror questionnaire, Lett summarized her feelings on the death penalty as "it depends, maybe it's the right thing." (Trial Transcript Vol. 62, pp. 261-262). She also stated that the death penalty should be imposed in cases which involved "taking another life on purpose," and indicated that she "strongly agree[d]" with the statement "[a]ny person who intentionally kills another should get the death penalty," adding, in her own words, "they took a life, willing to give up their own [sic]." Id. at 262). Lett also stated that she had never given the death penalty much thought until being included in the jury pool. Id. at 265. At voir dire, Lett stated the following:

> Q:     I see that you said you have mixed feelings about the
>        death penalty as well, is that right?
>
> Lett:  Yes, sir.
>
> Q:     What is that based on, please, ma'am?
>
> Lett:  Well, if you convince me on the evidence –
>
> Q:     Would you base your decision on the evidence?
>
> Lett:  Yes, sir.
>
> Q:     Are there cases in which you could vote for the death
>        penalty under certain kinds of facts, certain kinds of
>        cases?
>
> Lett:  Well, I think the death penalty, to me, I couldn't really
>        say, but, if it be a threat to the public –
>
> Q:     You're saying you could listen to the evidence and base
>        your decision on that issue on the evidence and on each
>        case as it comes to you?

27

Lett:   Yes, sir.

(Trial Transcript Vol. 33, pp. 5414-15) (Prosecutor Chapman, questioning).

In sum, one of the state's proffered reasons for striking a black potential juror is unsupported by the record, a fact which should have been included in the trial court's analysis of the third step of Batson, where all relevant circumstances must be examined to determine whether the State struck any jurors based on their race. Instead, the trial judge simply ruled that the prosecutor's reasons for striking jurors were not a pretext and did not violate Batson, without explanation or further investigation, and with two opposing versions before him of Lett's voir dire testimony and questionnaire content.  (Trial Transcript Vol. 42, p. 7241).

The state courts' failure to address the contradiction between the voir dire record and the State's proffered reasons for striking a black venire member is an unreasonable application of Batson to the facts of this case.  This finding is supported by the Supreme Court's decision in Miller-El v. Dretke ("Miller-El"), 545 U.S. 231 (2005).  In Miller-El, the Supreme Court ultimately held that "[t]he state court's conclusion that the prosecutors' strikes of [two black jurors] were not racially determined … was unreasonable as well as erroneous."  545 U.S. at 266.  At trial, the prosecution struck Billy Jean Fields, a black male who supported the death penalty.  Id. at 242.  The prosecution initially proffered the reason for striking Mr. Fields  was "he said that he could only give death if he thought a person could not be rehabilitated …"  Id. at 243.  The Court noted that the other evidence "unequivocally stated that he could impose the death penalty regardless of the

28

possibility of rehabilitation." Id. at 244.  The Court concluded that the prosecutor had either misunderstood or had an ulterior motive for keeping Mr. Fields off the jury.  Regardless, the Court ruled that the appeals court's judgment on the Fields strike was "unsupportable" because it failed to note that Fields had affirmed that he could give the death penalty if the law and evidence called for it.  Id. at 246.

Although Miller-El was a § 2254(d)(2) case, the Supreme Court's analysis is very persuasive to this court in analyzing § 2254(d)(1), since the Alabama Court of Criminal Appeals made no mention of the contradiction between Lett's voir dire testimony and questionnaire on the one hand, and the prosecutor's proffered reasons for striking her from the jury, on the other hand.

Therefore, because the Alabama Court of Criminal Appeals omitted the above highly relevant fact from its Batson analysis, the court did not undertake a review of "all relevant circumstances" as required by the third step of Batson.  Therefore, this court holds that the decision was an unreasonable application of clearly established federal law as determined by the Supreme Court.

### (b)    ANALYSIS UNDER § 2254(d)(2)

Even if this court did not find an unreasonable application of Batson under § 2254(d)(1), it would still find an unreasonable determination of the facts under § 2254(d)(2), for the following reasons.

Under AEDPA, a federal habeas court must find the state-court conclusion "an unreasonable determination of the facts in light of the evidence presented in the state court proceeding" before it can grant relief pursuant to § 2254(d)(2).  Thus,

this court can only grant Hall's petition if it finds that it was unreasonable to credit the prosecutor's race-neutral explanations for the <u>Batson</u> challenge.  State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by "clear and convincing evidence."  § 2254(e)(1).  <u>See also</u> <u>Miller-El</u>, 545 U.S. at 240.  This standard "is demanding but not insatiable." <u>Id.</u>

As stated above and repeated here for illustrative purposes, Hall objected to the prosecutor's explanation for striking venireperson Minnie Lett as pretextual. (Trial Transcript Vol. 42, p. 7238).  In her juror questionnaire, Lett summarized her feelings on the death penalty as "it depends, maybe it's the right thing."  (Trial Transcript Vol. 62, pp. 261-262).  She also stated that the death penalty should be imposed in cases which involved "taking another life on purpose," and indicated that she "strongly agree[d]" with the statement "Any person who intentionally kills another should get the death penalty," adding, in her own words, "they took a life, willing to give up their own [sic]."  (<u>Id.</u> at 262).  Lett also stated that she had never given the death penalty much thought until being included in the jury pool.  (<u>Id.</u> at 265).  At voir dire, Lett stated the following:

> Q:    I see that you said you have mixed feelings about the death penalty as well, is that right?
>
> Lett:  Yes, sir.
>
> Q:    What is that based on, please, ma'am?
>
> Lett:  Well, if you convince me on the evidence –

> Q:     Would you base your decision on the evidence?
>
> Lett:  Yes, sir.
>
> Q:     Are there cases in which you could vote for the death penalty
>        under certain kinds of facts, certain kinds of cases?
>
> Lett:  Well, I think the death penalty, to me, I couldn't really say, but,
>        if it be a threat to the public –
>
> Q:     You're saying you could listen to the evidence and base your
>        decision on that issue on the evidence and on each case as it
>        comes to you?
>
> Lett:  Yes, sir.

(Trial Transcript Vol. 33, pp. 5414-15) (Prosecutor, Chapman, questioning).

The prosecutor then peremptorily struck Lett from the venire, and subsequently offered a race-neutral reason for doing so when confronted with Hall's Batson challenge:

> Mrs. Lett was in one of the first panels that we brought in
> here.  She, in questioning, direct questioning, had strong
> reservations about the death penalty.  Said she'd never
> given it much thought.  She said that she would have great
> reservation in doing that.  She said that her choices would
> be life without parole, generally.  And we struck her for
> that reason.  We made notes of all these questionnaires,
> my associates did, during the questioning, by the way,
> Your Honor.  And our notes indicated that Mrs. Lett had a
> strong resistance to the death penalty.  We struck her for
> that reason.

(Trial Transcript Vol. 42, pp. 7232-33).  Thus, the prosecutor simply mischaracterized Lett's testimony and the content of her juror questionnaire.  He

31

represented that Lett had strong reservations about the death penalty, and that the prosecution team had notes of her questionnaire which supported that assertion, despite the fact that Lett's questionnaire actually showed that she strongly agreed with the statement that "Any person who intentionally kills another should get the death penalty," and despite the fact that Lett wrote on her questionnaire that "they took a life, willing to give up their own [sic]." See Trial Transcript Vol. 62, pp. 261-262. The prosecutor also stated that Lett's voir dire testimony revealed "strong reservations about the death penalty," despite her unambiguous affirmation that she could listen to the evidence and base [her] decision on the evidence presented at trial; and despite the total absence of any statement that could be construed as indicative of strong reservations about capital punishment. See Trial Transcript Vol. 33, pp. 5414-15.

By contrast, the prosecutor did not strike several white members of the venire whose voir dire testimony revealed either close similarities to Lett's statements about the death penalty, or expressed strong reservations about the death penalty. A side-by-side comparison of Lett and these white venirepersons, both of whom ultimately served on the jury that convicted Hall, tends to undercut the prosecutor's race-neutral explanation, as discussed below. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step." Miller-El at 241.

32

Flora Hutto, a 51 year-old white woman who ultimately was selected to serve as a juror, stated in her questionnaire that she "hadn't really thought about" the death penalty, and stated that she had no opinion about it or about the purposes that capital punishment serves, nor the types of cases or offenses where the death penalty should be imposed.  (Trial Transcript, Vol. 61, pp. 69-72).  Hutto did, however, indicate that she "agre[ed] somewhat" with the statement "Any person who intentionally kills another should get the death penalty."  Id. at 70.   Under questioning at voir dire, Hutto stated the following:

> Q:      Would you describe yourself as being in – in favor of the death penalty for the intentional killing of a person?
>
> Hutto:  I've never really had to say what I'd really do, but, I feel like it's according to the crime …
>
> Q:      If the State proved that it was a murder and burglary –
>
> Hutto:  Yes.
>
> Q:      -- and you were sure of that, you were sure of that to the extent that you voted to convict him and the other eleven jurors were also equally convinced, strong evidence, would, in that situation, would you vote for the death penalty for Mr. Hall?
>
> Hutto:  No.
>
> Q:      You would not?
>
> Hutto:  No.

| | |
|---|---|
| Q: | Okay. What – what further evidence would you be looking for? |
| PROSECUTOR: | Your Honor, I'm going to object to that question in that form … |
| Q: | …  Do you think – do you feel that life without parole is an appropriate punishment for someone who intentionally killed another person? |
| Hutto: | Intentionally killed? |
| Q: | Another person? |
| Hutto: | It's possible. |
| Q: | Ma'am? |
| Hutto: | It's possible. |
| Q: | It's possible? |
| Hutto: | Life without parole would be more appropriate than the death penalty. |

(Trial Transcript Vol. 34, p. 5681-93) (Questioning by defense counsel).

As noted above, Hutto stated in her questionnaire that she "hadn't really thought about" her position on the death penalty, like Minnie Lett had done.  (Trial Transcript, Vol. 61, p. 69).  Yet this was one of the prosecutor's race-neutral reasons for peremptorily striking Lett from the venire, while Hutto went on to serve on the jury, despite making the same statement.  See Trial Transcript Vol. 42, p. 7232. Furthermore, Hutto expressed greater reservations and doubts about the death penalty in her voir dire testimony than Lett did, telling the prosecutor that she

34

believed a sentence of life in prison without parole was possibly a more appropriate punishment for capital murder than the death penalty.  See Trial Transcript Vol. 34, p. 5693.  The prosecutor did not deem such reservations to be an impediment to Hutto's ability to serve on the jury, yet apparently believed that Lett's statements merited a peremptory strike, despite the fact that they were far more supportive of the death penalty.

Another white venireperson, Ann Chandler, a 45 year-old woman who also went on to serve as a juror, stated in her juror questionnaire that she had "mixed feelings" about the death penalty, and "disagree[d] somewhat" with the statement "Any person who intentionally kills another should get the death penalty."  (Trial Transcript Vol. 61, pp. 121-122).  However, Chandler's reservations about capital punishment were tempered by other statements contained in her questionnaire, including her opinion that "someone who intentionally plans a murder should not have the privilege of living."  (Id. at 124).  At voir dire, Ann Chandler stated the following:

> Q:     … now you answered in your questionnaire that you have mixed feelings about the death penalty and it depends on the magnitude of the crime, is that right? Is that still your opinion? ...
>
> A.C.:  Yes, sir …
>
> Q:     … Just because this Defendant or a defendant might have been found guilty of capital murder, murder during the course of a burglary, murder during the course of a robbery, or whatever it might be, would you automatically, in every case, vote for the death penalty?

A.C.   Not necessarily, not unless you heard everything –

Q:     Well, when I say – when you heard everything, could you
       listen and consider the Defendant's background and his
       family history and his age and his mental capabilities and
       all that before you made that decision about whether or
       not the death penalty or life without parole came into
       being?

A.C.:  Make my decision before I heard all that?

Q:     Yes.

A.C.:  No, I wouldn't.

Q:     You would listen to that first?

A.C.:  Uh-huh …

Q:     … if you found a person guilty of capital murder would
       you automatically vote for the death penalty?

A.C.:  Not unless you – not unless I had, you know, all the
       circumstances around it.

(Trial Transcript Vol. 33, pp. 5530-35) (Prosecutor, Chapman, questioning).

        The voir dire testimony of Minnie Lett and Ann Chandler is similar in that

they both admitted to the prosecutor that they had mixed feelings about the death

penalty, and both stated that they would listen to the evidence in reaching a

decision on what penalty to vote for.  Chandler and Lett each wrote similar

statements on their questionnaire that were supportive of capital punishment

(Chandler's statement that "someone who intentionally plans a murder should not

have the privilege of living" and Lett's statement that "they took a life, willing to

36

give up their own [sic].").  That Chandler, a white woman, would be selected to serve on the jury while Lett, a black woman, would be peremptorily struck by the prosecutor after they both expressed substantially similar views on the death penalty makes the prosecutor's race neutral reason unlikely.

The Alabama Court of Criminal Appeals concluded that there was no evidence of disparate treatment between prospective black jurors and prospective white jurors, and noted that the prosecutor also listed five white venirepersons who were struck due to their views on the death penalty, citing Travis v. State, 776 So.2d 819, 839 (Ala.Crim.App. 1997), for the notion that "[t]he fact that the prosecutor's strike against a white venire member was based on the same reason as that for striking the black venire member indicates that the reason was properly race-neutral."  Hall, 820 So.2d at 131-132.  However, this court notes that in Travis, unlike this case, there was no argument or suggestion of a contradiction between the voir dire record, on the one hand, and the State's proffered race-neutral reasons for striking a black venire member, on the other hand.

In sum, the Lett's voir dire testimony and questionnaire cast the prosecutor's reasons for striking Lett in an implausible light.  Comparing her strike with the treatment of white venire members who expressed similar views, or views openly skeptical of the death penalty, heaps even more doubt upon the prosecutor's explanations.  Therefore, this court finds that the state court's affirmation of Hall's conviction in light of such contradictions constitutes "an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding" pursuant to 28 U.S.C. § 2254(d)(2).

        **(c)**      **DE NOVO REVIEW**

Since this court has determined that the state court decision on direct appeal was an unreasonable application of clearly established federal law and an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, this court is now "unconstrained by § 2254's deference and must undertake a de novo review of the record." McGahee, 560 F.3d at 1266. Therefore, this court now reviews the record below to determine if there was a Batson violation by the State.

As outlined above, district courts employ a three-step procedure for resolving Batson objections. United States v. Alen-Brown, 243 F.3d 1293, 1297 (11th Cir. 2001). First the objecting party must make a prima facie showing that the objected-to peremptory challenge was based on race. Here, there is no question that Hall has established a prima facie case of racial discrimination, for the trial court found that Hall made such a showing pursuant to Ex Parte Branch. (Trial Transcript, Vol. 42, p. 7220). Second, the state is required to provide specific explanations for all its peremptory challenges, a task which the State has done in the present case. See id. at 7221-37. Third, Batson requires this court to review "the State's proffer of specific explanations after the trial to see whether its explanations overcome the very strong prima facie case of discrimination." McGahee, 560 F.3d at 1267. In this analysis, this court shall "review all relevant circumstances. " (Id. at 1266)

38

(quotation marks omitted).  "[T]he rule in <u>Batson</u> provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it." <u>Miller-El II</u>, 545 U.S. at 251-52.  The objecting party may carry its burden by showing that the striking party's race-neutral reason is mere pretext for discrimination.  <u>Id.</u> at 247-49 (analyzing for pretext the prosecution's reasons for striking a prospective juror).

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination at step three is the persuasiveness of the prosecutor's justification for his peremptory strike.  At this stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination."  <u>Miller-El I</u>, 537 U.S. at 338-39 (internal quotation marks and citations omitted).  "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson's</u> third step."  <u>Miller-El II</u>, 545 U.S. at 241.

While Hall has challenged many of the specific explanations in his petition, this court need not decide whether every peremptory strike of a black potential juror in this case was racially motivated.  As the Court of Appeals for the Eleventh Circuit has stated, "under <u>Batson</u>, the striking of one black juror for a racial reason violates the Equal Protection Clause, even where other black jurors are seated, and even when valid reasons for the striking of some black jurors are shown."  <u>United</u>

States v. David, 803 F.2d 1567, 1571 (11th Cir. 1986); see also Snyder v. Louisiana, 552 U.S. 472, 478 (2008) ("Because we find that the trial court committed clear error in overruling petitioner's Batson objection with respect to [one juror], we have no need to consider petitioner's claim regarding a [second juror].").  This court focuses, therefore, on one strike in particular in which Hall claims the prosecution engaged in purposeful discrimination, that of Minnie Lett.  Because this court finds that the State's explanations for striking Lett are implausible and therefore pretextual, this court harbors no doubt in holding that the State violated Hall's and Lett's Equal Protection rights as defined by Batson and as further clarified by Powers.

As described in detail, supra, and summarized here for completeness' sake, in her juror questionnaire, Lett summarized her feelings on the death penalty as "it depends, maybe it's the right thing." (Trial Transcript Vol. 62, pp. 261-262).  She also stated that the death penalty should be imposed in cases which involved "taking another life on purpose," and indicated that she "strongly agree[d]" with the statement "any person who intentionally kills another should get the death penalty," adding, in her own words, "they took a life, willing to give up their own [sic]." (Id. at 262).  Lett also stated that she had never given the death penalty much thought until being included in the jury pool.  (Id. at 265).  At voir dire, Lett admitted that she had "mixed feelings" about the death penalty, but also testified that she would listen to and base her decision upon the evidence. (Trial Transcript Vol. 33, p. 5414-15) (Prosecutor Chapman, questioning).

Upon the trial court's finding of a prima facie case of racial discrimination, the prosecutor offered his allegedly race-neutral reasons for striking Lett from the jury, and proceeded to mischaracterize Lett's testimony and the content of her juror questionnaire. He represented that Lett had strong reservations about the death penalty, and that the prosecution team had notes of her questionnaire which supported that assertion, despite the fact that Lett's questionnaire actually showed that she strongly agreed with the statement that "any person who intentionally kills another should get the death penalty," and despite the fact that Lett wrote on her questionnaire that "they took a life, willing to give up their own [sic]." See Trial Transcript Vol. 62, pp. 261-62. The prosecutor also stated that Lett's voir dire testimony revealed "strong reservations about the death penalty," despite her unambiguous affirmation that she could listen to the evidence and base her decision on the evidence presented at trial; and despite the total absence of any statement that could be construed as indicative of strong reservations about capital punishment. See Trial Transcript Vol. 33, pp. 5414-15.

By contrast, the prosecutor did not strike two white members of the venire whose voir dire testimony revealed either similarities to Lett's statements about the death penalty, or expressed strong reservations about the death penalty. A side-by-side comparison of Lett and these white venirepersons, both of whom ultimately served on the jury that convicted Hall, tends to undercut the prosecutor's race-neutral explanation, as discussed below. "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who

41

is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at <u>Batson's</u> third step." <u>Miller-El</u> at 241.

The first white juror was Flora Hutto, a 51 year-old white woman who stated in her questionnaire that she "hadn't really thought about" her position on the death penalty. (Trial Transcript, Vol. 61, p. 69). Yet this statement was one of the prosecutor's race-neutral reasons for peremptorily striking Lett from the venire, while Hutto went on to serve on the jury, despite making the same statement. <u>See</u> Trial Transcript Vol. 42, p. 7232. Furthermore, Hutto expressed greater reservations and doubts about the death penalty in her voir dire testimony than Lett did, telling the prosecutor that she believed a sentence of life in prison without parole was possibly a more appropriate punishment for capital murder than the death penalty. <u>See</u> Trial Transcript Vol. 34, p. 5693. The prosecutor did not deem such reservations to be an impediment to Hutto's ability to serve on the jury, yet apparently believed that Lett's statements merited a peremptory strike, despite the fact that they were far more supportive of the death penalty.

Another white venireperson, Anne Chandler, a 45 year-old woman who also went on to serve as a juror, stated in her juror questionnaire that she had "mixed feelings" about the death penalty, and "disagreed somewhat" with the statement "any person who intentionally kills another should get the death penalty." (Trial Transcript Vol. 61, pp. 121-122). This is reveals a greater degree of reservation about the death penalty than Lett's questionnaire, which indicated that she "strongly agre[ed]" with the same statement. (Trial Transcript Vol. 62, pp. 261-62).

42

Chandler's reservations about capital punishment were tempered by other statements contained in her questionnaire, including her opinion that "someone who intentionally plans a murder should not have the privilege of living." (Id. at 124).  This remark is not substantially different from Lett's remark that "they took a life, willing to give up their own [sic]." (Trial Transcript Vol. 62, p. 262).

Thus, the voir dire testimony of Anne Chandler and Minnie Lett is similar in that they both admitted to the prosecutor that they had mixed feelings about the death penalty, and both stated that they would listen to the evidence in reaching a decision on what penalty to vote for.  Chandler and Lett each wrote similar statements on their questionnaire that were supportive of capital punishment (Chandler's statement that "someone who intentionally plans a murder should not have the privilege of living" and Lett's statement that "they took a life, willing to give up their own [sic].").

That Flora Hutto and Anne Chandler, both white women, would be selected to serve on the jury while Minnie Lett, a black woman, would be peremptorily struck by the prosecutor due to her alleged reservations about the death penalty -- after each one of the three women expressed substantially similar views on capital punishment -- makes the prosecutor's race neutral reason unconvincing and implausible and suffices for the determination that there was a Batson error.  See Snyder 552 U.S. at 478.

In reviewing "all relevant circumstances" in this record, this court finds that it "blinks reality" to deny that the State struck Minnie Lett because she was

African-American.  <u>Miller-El II</u>, 545 U.S. at 266.  The record in this case compels a finding that the State's use of a peremptory strike in this case to dismiss Lett from the jury venire constituted intentional discrimination and violated Hall's rights under the Equal Protection Clause and the clearly established law as determined by the Supreme Court in <u>Batson</u>.  The court is cognizant of the fact that Hall and Lett do not share the same racial identity (i.e., Hall is white and Lett is black).  Nevertheless, "[t]o bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service."  <u>Powers</u>, 499 U.S. at 415.

This issue alone is sufficient for the court to conditionally grant Hall's petition for a writ of habeas corpus.  However, the court will proceed to review the remaining issues raised by Hall in his petition.

**CLAIM #2:  HALL'S CLAIM THAT THE CHANGE OF VENUE TO MONROE COUNTY VIOLATED HIS RIGHT TO A FAIR TRIAL AND AN IMPARTIAL JURY**

Hall argues that the trial court's change of venue to Monroe County from Conecuh County deprived him of an impartial jury and a fair trial because Monroe County was allegedly even more "saturated" by prejudicial pretrial media reports than was Conecuh County.  (Doc. 1, pp. 33-37).

On direct appeal, the Alabama Court of Criminal Appeals examined the venue issue on the merits, and addressed both actual and presumed prejudice standards.  <u>See</u>, <u>e.g.</u>, <u>Coleman v. Zant</u>, 708 F.2d 541, 544 (11th Cir. 1983) (in analyzing whether a defendant's trial was deprived of fundamental fairness by

pretrial publicity or an inflamed community atmosphere, courts consider both an "actual prejudice" standard and a "presumed prejudice" standard).

Actual prejudice requires that a defendant show both (i) "that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty" and (ii) that such jurors "could not have laid aside these preformed opinions and rendered a verdict based on the evidence presented in court." Coleman, 708 F.2d at 544 (citations and internal marks omitted); see also Mills v. Singletary, 63 F.3d 999, 1009 (11th Cir. 1995) (similar). Presumed prejudice, on the other hand, may arise from pretrial publicity when (i) "pretrial publicity is sufficiently prejudicial and inflammatory," and (ii) "the prejudicial pretrial publicity saturated the community." Coleman, 708 F.2d at 541; see also Mills, 63 F.3d at 1010 (similar). "[T]he principle of presumed prejudice is rarely applicable and reserved for extreme situations." Mills, 63 F.3d at 1010 (citations and internal quotation marks omitted). More generally, "the burden placed upon the defendant to show that pretrial publicity deprived him of his right to a fair trial before an impartial jury is an extremely heavy one." United States v. Campa, 459 F.3d 1121, 1143 (11th Cir. 2006) (citation and internal marks omitted).

In applying these federal constitutional standards to Hall's circumstances, as to presumed prejudice, the Alabama Court of Criminal Appeals noted that Hall had attached just one newspaper article to his motion, which appeared in the Monroe Journal several days before Hall's trial was scheduled to begin. Hall, 820 So.2d at 123. Hall argued that 25 of the 88 jurors who composed the jury venire, or 28%,

stated that they had seen or read the article.  Id.  The majority of these
veniremembers who read the article were stricken for cause, and the remaining
members stated that the article would not affect their ability to be impartial.  Id. at
123-24.  The Alabama Court of Criminal Appeals found that "[t]here was absolutely
nothing that suggested that the article 'saturated' the community with prejudicial
publicity," and held that Hall failed to show presumed prejudice.  Hall, 820 So.2d at
124.

      As to actual prejudice, the Alabama court likewise found that the defense had
not met its burden because Hall did not argue that any of the jurors who read the
Monroe Journal and remained on the panel were not impartial.  Id.  Because Hall
had not shown that jurors were either presumptively or actually prejudiced, the
Alabama Court of Criminal Appeals concluded that the trial court did not err in
denying the defense's request for change of venue.  Id.

      Nothing about the state court's treatment of the venue issue was contrary to,
or involved an unreasonable application of, clearly established federal law as
required by § 2254(d)(1).  For one thing, Hall's petition does not identify whether he
takes issue with the state court's conclusions under the actual prejudice or the
presumed prejudice standards.  Instead, he lists two factors that he claims entitle
him to relief: (i) the newspaper article in the Monroe Journal which described the
acts with which Hall was charged, and gave a complete list of all the people called
for jury service in Hall's trial; and (ii) the fact that more than half the venire
admitted exposure to pretrial publicity.   (Doc. 1, at 33-35.)

These factors simply do not satisfy petitioner's burden under either prong of the "presumed prejudice" standard, inasmuch as they do not show that the nature of the publicity was inflammatory at all (as opposed to merely factual), or that the community was saturated by the pretrial publicity, or that this case fits within the narrow band of "extreme situation[s]" where prejudice may be presumed.  See generally Gaskin v. Secretary, Dep't of Corrections, 494 F.3d 997, 1005 (11th Cir. 2007) (no habeas error in denial of petitioner's motion for change of venue, even though articles published in local paper "may have been somewhat prejudicial or inflammatory" and "92% of potential jurors and 11 of the 12 jurors at trial had read newspaper accounts of the crime"); Campa, 459 F.3d at 1144 (explaining that prejudice cannot be presumed absent a trial atmosphere "utterly corrupted by press coverage"); Baldwin v. Johnson, 152 F.3d 1304, 1314 (11th Cir. 1998) ("The fact that a case generates widespread publicity does not, in and of itself, warrant a change of venue."); see also Murphy v. Florida, 421 U.S. 794, 800 n.4 (1975) (distinguishing "largely factual publicity from that which is invidious or inflammatory," and noting that "[t]o ignore the real differences in the potential for prejudice would not advance the cause of fundamental fairness, but only make impossible the timely prosecution of persons who are well known in the community").

Hall's invocation of the landmark Supreme Court cases involving prejudicial pretrial publicity also falls short of the mark because the facts of his case, as he alleges them, do not rise to the "carnival atmosphere" discussed in Sheppard v. Maxwell, 384 U.S. 333, 354 (1966) ("For months the virulent publicity about

47

Sheppard and the murder had made the case notorious. Charges and counstrcharges were aired in the news media besides those for which Sheppard was called to trial.  In addition, only three months before trial, Sheppard was examined for more than five hours without counsel during a three-day inquest which ended in a public brawl. The inquest was televised live from a high school gymnasium seating hundreds of people."); Rideau v. State of Louisiana, 373 U.S. 723, 725 (1963) (Describing as a "spectacle" the fact that "[w]hat the people of Calcasieu Parish saw on their television sets was Rideau [the defendant], in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping, and murder, in response to leading questions by the sheriff."); or Irvin v. Dowd, 366 U.S. 717, 727 (1961) ("An examination of the 2,783-page voir dire record shows that 370 prospective jurors or almost 90% of those examined on point … entertained some opinion as to guilt – ranging in intensity from mere suspicion to absolute certainty …of the voir dire examination of a majority of the jurors finally placed in the jury box[,] [e]ight out of the 12 thought petitioner was guilty.").

Accordingly, this ground for relief is without merit because Hall has failed to demonstrate how the state court's treatment of the change of venue issue is redressable in habeas proceeding pursuant to § 2254(d).  Hall has identified no U.S. Supreme Court precedent which is materially indistinguishable or contrary to the state courts' disposition of this issue.  Furthermore, fair-minded jurists could agree with the state court's adjudication of this issue in light of the evidence presented there; thus, habeas relief is unavailable with regard to Claim #2.

**CLAIM #3:**  **HALL'S CLAIM THAT THE TRIAL COURT PREVENTED HIM FROM PRESENTING A DEFENSE**

Hall argues that the trial court denied him a fair trial by prohibiting him from introducing evidence tending to show that Hall's co-defendant, Wayne Travis, murdered Mrs. Haskew pursuant to a pattern or plan, without Hall's knowledge. (Doc. 1, p. 37).  This evidence was summarized by the Alabama Court of Criminal Appeals as "evidence that his codefendant Travis was from the McKenzie area where the victim lived, had had a troubled childhood, had been convicted of several offenses such as burglary, and on one prior occasion had been arrested for stealing from the victim.  Also, Hall wanted to present evidence that Travis had said that he was going to kill a former teacher when he was released from prison."[5]  Hall, 820 So.2d at 134-35.  Hall asserts that "[b]y demonstrating Travis' pattern of escalating crimes against people in his hometown, as well as his premeditation to kill, defense counsel sought to prove that Travis killed Mrs. Haskew and that Mr. Hall did not participate intentionally in her death." (Doc. 1, pp. 41).

The Alabama Court of Criminal Appeals denied this claim, ruling that the evidence which Hall sought to introduce was correctly excluded because it was not relevant to Hall's innocence and did not tend to exonerate him.  Hall, 820 So.2d at 135.  The appeals court also pointed out that there was ample evidence that both Travis and Hall were active participants in the burglary-murder, and that both were seen around the Schad residence around the time it was burgled.  Id.

---

[5] Haskew was a retired schoolteacher.

Although Hall does not explicitly allege a basis upon which this court can grant a writ of habeas corpus under either § 2254(d)(1) (i.e., contrary to and/or an unreasonable application of federal law as set forth by the Supreme Court) or § 2254(d)(2) (i.e., resulting in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding), he does cite a number of Supreme Court precedents which could be construed as a claim under § 2254(d)(1): Washington v. Texas, 388 U.S. 14 (1967); Chambers v. Mississippi, 410 U.S. 284 (1973); Green v. Georgia, 442 U.S. 95 (1979); Beck v. Alabama, 447 U.S. 625 (1980); Crane v. Kentucky, 476 U.S. 683 (1986); Holmes v. South Carolina, 547 U.S. 319 (2006); United States v. Scheffer, 523 U.S. 303, 308 (1998); and Rock v. Arkansas, 484 U.S. 44, 61 (1987).  Unfortunately for Hall, these cases are materially distinguishable from his case, and furthermore cannot support an argument that Alabama courts unreasonably applied Supreme Court precedent.

For example, unlike in Hall's case, the excluded testimony in Washington tended to exonerate the defendant.  Washington, 388 U.S. 14, 16 (1967) ("The record indicates that [defense witness] would have testified that petitioner pulled at him and tried to persuade him to leave, and that petitioner ran before Fuller fired the fatal shot.").  The same is true of Chambers, where the U.S. Supreme Court's holding revolved around the fact that "The State's proof at trial excluded the theory that more than one person participated in the shooting of [the victim].  To the

extent that [a different suspect's] confession tended to incriminate him, it tended also to exculpate [the defendant]." Chambers, 410 U.S. at 297.

In Green, the defendant was seeking to prove that he was not even present when the victim was murdered – a fact which clearly is not at issue in Hall's case. Green, 442 U.S. at 96. Beck is also distinguishable because, unlike this issue, it involved the question of whether a state-law prohibition on giving lesser included offense instructions in capital cases violated the Eighth Amendment by substantially increasing the risk of error in the fact-finding process. Beck, 447 U.S. at 632. Similarly, the facts at issue in Crane are materially distinguishable because there, the question of admissibility centered upon "proffered testimony about the circumstances of petitioner's confession." Crane, 476 U.S. at 690. Here, Hall did not seek to introduce any evidence concerning a confession.

In Holmes, the Supreme Court vacated the petitioner's death sentence because the state rule that excluded defense evidence of a third-party's guilt did so not by focusing on the probative value or potential adverse effects of admitting the defense evidence, but instead by inquiring as to the strength of the prosecution's case. Holmes, 547 U.S. at 327. That is not at issue here. In U.S. v. Scheffer, the U.S. Supreme Court upheld a military court's decision to exclude the results of a polygraph test which the defendant sought to admit, ruling that the evidentiary rule relied upon by the trial court served various legitimate governmental interests. Scheffer, 523 U.S. at 309-13. Thus, Scheffer bears no factual similarity to Hall's case whatsoever, and clearly cannot form the basis of a grant of habeas relief under

51

§ 2254(d)(1).  Finally, in <u>Rock</u>, the Supreme Court reversed a state courts' exclusion of the defendant's "hypnotically refreshed" testimony as impermissibly restricting her right to testify in her own defense.  <u>Rock</u>, 483 U.S. at 49-50.  Here, Hall was not prevented from testifying on his own behalf, nor from introducing prior statements which might comprise such testimony.  Therefore, like the other U.S. Supreme Court precedent Hall cited on this issue, <u>Rock</u> is materially distinguishable from Hall's case.

Furthermore, this issue does not turn on a finding of fact by the trial court that is susceptible to a charge that it was objectively unreasonable.  The trial court's exclusion of evidence was a legal ruling rather than a factual one, and in any event, Hall has not offered any evidence to rebut the presumption of correctness that the trial court enjoys.  Accordingly, habeas relief on this issue is denied pursuant both to § 2254(d)(1) and § 2254(d)(2).

## CLAIM #4:  HALL'S CLAIM THAT THE TRIAL COURT VIOLATED HIS RIGHTS BY FAILING TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF FELONY-MURDER

Hall argues that the trial court failed to instruct the jury on the lesser included offense of felony-murder, thus violating his rights to a fair trial and Fourteenth Amendment due process rights under the U.S. Constitution.  (Doc. 1, p. 45).  However, the record does not reflect that Hall requested a felony murder instruction.  The record <u>does</u> clearly show, on the other hand, that the trial judge provided instructions to the jury on the lesser included offenses of intentional murder and first-degree burglary.  (Trial Transcript Vol. 45, p. 7885).

On this record, the fact that the trial judge did not instruct the jury on felony murder as a lesser offense to capital murder appears entirely valid and proper.  The Alabama Court of Criminal Appeals' conclusion that the evidence did not support such charges, see Hall, 820 So.2d at 139, was not unreasonable and, indeed, was not erroneous at all.  Even if the failure to provide such instructions was error, however, Hall's attempt to parlay that error into a constitutional deprivation is misguided.  Petitioner relies for this argument on Beck v. Alabama, 447 U.S. 625, (1980), in which the Supreme Court declared that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction."  Id. at 637.

In arguing a violation of Beck, however, Hall ignores both Supreme Court and Eleventh Circuit precedent making clear that Beck does not apply where, as here, a capital defendant does receive charges on certain lesser included offenses, just not on every single lesser included offense that the evidence might support, or that the defendant might desire.  See, e.g., Schad v. Arizona, 501 U.S. 624, 646-47 (1991) ("Our fundamental concern in Beck was that a jury convinced that the defendant had committed some violent crime but not convinced that he was guilty of a capital crime might nonetheless vote for a capital conviction if the only alternative was to set the defendant free with no punishment at all. … This central concern of

53

<u>Beck</u> simply is not implicated in the present case, for petitioner's jury was not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence."); <u>Powell v. Allen</u>, 602 F.3d 1263, 1271 (11th Cir. 2010) (determining that <u>Beck</u> did not entitle capital defendant to jury instruction on felony murder, where charge included capital murder, intentional murder and manslaughter, such that "the jury was not faced with the 'all-or-nothing choice' <u>Beck</u> is concerned with").

In light of these principles, this court cannot find that the Alabama Court of Criminal Appeals' conclusion was contrary to or an unreasonable application of <u>Beck</u>, under § 2254(d)(1), nor was it an objectively unreasonable determination of the facts under § 2254(d)(2).

## CLAIM #5:  HALL'S CLAIM THAT THE TRIAL COURT'S OVERREACHING DURING VOIR DIRE DEPRIVED HALL OF A JURY THAT WAS SELECTED FROM A GROUP OF HIS PEERS

Hall claims next that the trial court impermissibly rehabilitated potential jurors who indicated that they would automatically vote for the death penalty. (Doc. 1, p. 49).  In so doing, Hall alleges that the trial court "overreached the bounds of propriety" and forced him to exercise peremptory challenges in order to exclude unqualified jurors who should have been stricken for cause.  <u>Id.</u>

The Alabama Court of Criminal Appeals stated on direct appeal that it could "find no place in the voir dire where Hall challenged the way in which the trial court conducted voir dire examination.  Therefore, our review of this issue is limited to review under the plain-error doctrine."  <u>Hall</u>, 820 So.2d at 124.  However, as Hall

54

points out in his petition, defense counsel did raise objections on this point, stating

that:

> … before we bring the panel in, I'd like to follow up with that
> last panel and voice an objection to the manner and procedure
> which the Court employed in the rehabilitation of the jurors … I
> think that was totally unnecessary for the Court to try and
> rehabilitate those witnesses in the manner and fashion in which
> the Court did.

Trial Transcript Vol. 34, pp. 5609-10;

> Judge, we'd like to interpose an objection to the Court, Your
> Honor, going beyond your original charge … in my opinion,
> trying to rehabilitate jurors that have expressed their – their
> death penalty views …

Trial Transcript Vol. 38 and 39, pp. 6599-6604;

> I object … to the statements of the Court in qualifying the venire
> which deviated from the original qualifications that you
> originally used with the original panel to and include the
> definitional aspects, the – the interrogations of Theresa
> Richardson, Martha Montgomery, and, especially, as to Danny
> Jordan.  Danny Jordan had equivocally stated that he would
> impose the death penalty and now you have, in my opinion,
> rehabilitated [him] …

Trial Transcript Vol. 39, pp. 6649-50.

In response to defense counsel's objections, the trial judge responded:

> "For the record, your characterization of  trying to rehabilitate is
> incorrect. The Court was faced with a situation where the Court
> was getting mutually contradictory responses from the jurors
> indicating they did not understand the question.  The Court was
> merely trying to find out what their true feelings were … when I
> get mutually contradictory responses my responsibility is to find
> out what they feel.  It was obvious to me they were confused and
> a lot of work had to be done to figure out what their true feelings
> were."

Trial Transcript Vol. 34, pp. 5612-13.

Despite not finding the defense objections in the record, the Alabama Court of Criminal Appeals nevertheless held that the trial court's questioning of prospective jurors was neither error nor plain error because "the conduct of voir dire examination is discretionary with the trial court." Hall, 820 So.2d at 124. The Court of Criminal Appeals also cited the Florida Supreme Court for the proposition that having the trial court rehabilitate jurors is a practice favored by reviewing courts. Id. at 125 (citing Bryant v. State, 601 So.2d 529, 532 (Fla. 1992)).

In his habeas petition, Hall cites Morgan v. Illinois, 504 U.S. 719 (1992), in which the U.S. Supreme Court reversed a death sentence because the trial court refused to ask potential jurors whether they would automatically vote to impose the death penalty. Morgan, 504 U.S. at 723. Instead, the trial court inquired only as to whether potential jurors' would automatically vote *against* the death penalty. The Supreme Court held that this was constitutionally insufficient, and that a court must allow an inquiry into prospective jurors' views on capital punishment to determine whether the juror would vote automatically for a death sentence at the penalty phase. Id. at 729. Since such an inquiry did not happen at voir dire in Morgan, the Supreme Court held that it violated the Due Process Clause of the Fourteenth Amendment. Id.

In this case, on the other hand, such an inquiry did take place. The trial court did ask prospective jurors whether they would automatically vote for the death penalty upon returning a guilty verdict. Secondly, the question posed by Hall's petition – whether and when a trial court has impermissibly rehabilitated

jurors who the defendant believes should be struck for cause -- was not addressed in Morgan.

Hall also cites the U.S. Supreme Court's opinion in Swain v. Alabama, 380 U.S. 202, 219 (1965) overruled by Batson, 476 U.S. 79, to support his argument that the trial court's alleged rehabilitation of jurors unconstitutionally infringed upon the exercise of his peremptory challenges.  (Doc. 1, p. 55).  In Swain, the U.S. Supreme Court held that "[t]he denial or impairment of the right [to a peremptory challenge] is reversible error without a showing of prejudice …"  Id.  Yet this cited portion of Swain does not address the rehabilitation question raised in Hall's petition.  See Swain 380 U.S. at 219.  Instead, this part of Swain (which was later overruled by Batson) addressed the  state's use of peremptory strikes to remove black citizens from the jury pool.  Id. at 220-21.  On this basis, the court finds that Swain is materially distinguishable from Hall's case.

Having considered Hall's argument in light of Morgan and Swain, this court finds that the Alabama Court of Criminal Appeals did not decide the case differently than the U.S. Supreme Court on a set of materially indistinguishable facts, nor can it be said that it unreasonably applied a governing principle of either Morgan or Swain to Hall's case, therefore, relief pursuant to § 2254(d)(1) is denied with regard to this issue.  Furthermore, in light of the trial court's explanation of its sua sponte questioning of potential jurors, this court finds that the decision of the Alabama Court of Criminal Appeals did not result in an unreasonable

determination of the facts in light of the evidence presented in the state court.

Thus, relief pursuant to §2254(d)(2) is also inappropriate.

**CLAIM #6:  HALL'S CLAIM THAT THE TRIAL COURT'S FAILURE TO REMOVE JURORS FOR CAUSE WHO WERE UNQUALIFIED TO SERVE DENIED HALL A FAIR TRIAL AND VIOLATED HIS RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH  AMENDMENTS AND ALABAMA LAW**

Hall argues that the trial court violated his constitutional rights at voir dire when it denied his challenges of certain jurors for cause, allegedly depriving him of a fair trial and an impartial jury, and infringing upon his exercise of peremptory strikes.  (Doc. 1, p. 58).  Hall asserts that the jurors he sought to strike for cause were those who expressed views on the death penalty that "were so strong that they could not be impartial if they served on the jury," and who would not be able to consider mitigating circumstances at the penalty phase as required by Alabama law.  Id. at 58-59.  Hall's habeas petition includes the names of eight jurors whom he claims should have been struck for cause.  These venire members include: Elizabeth McKinley, Leroy Rogers, Ann Chandler, Donald Spencer, Keely "Tootie" Waters, Diane Harrison, Norman Barnett, and Bennie Norris.  (Id. at 58-62).

**(1)    Hall's Objections To Individual Jurors**

**(a)    Juror Elizabeth McKinley**

Hall claims that the first juror discussed in his petition, Elizabeth McKinley, demonstrated through her questionnaire and voir dire responses that she would automatically vote for the death penalty, "without regard to the mitigating circumstances."  (Doc. 1, pp. 60-61).  McKinley, along with all the other members of

her voir dire panel, initially raised her hand when the trial court asked who would always impose the death penalty if it were shown that the defendant intentionally murdered the victim.  (Trial Transcript Vol. 33, p. 5512).  In her juror questionnaire, McKinley indicated that she "strongly agreed" with the statements that "any person who intentionally kills another should get the death penalty," and "any person who helps someone who intentionally kills another should be eligible for the death penalty."  (Trial Transcript Vol. 62, pp. 367-68).  Additionally, Hall argues that when questioned by counsel at voir dire, McKinley "did not retreat from her first statement that she would vote for the death penalty if the defendant was found guilty 'regardless of the evidence produced.'"  (Doc. 1, p. 60).

The voir dire transcript does not support Hall's argument.  Although the record does indicate that all six members of McKinley's panel raised their hands when asked who would always vote for the death penalty, the transcript also shows that jurors raised their hands when asked if they could follow Alabama law and weigh the aggravating and mitigating circumstances.  (Id. at 5513-16).  The trial judge even expressed frustration at these "mutually contradictory" answers, and felt it necessary to explain that jurors could not answer "yes" to both questions (i.e., either the jurors would automatically vote for the death penalty, or they would weigh the aggravating and mitigating circumstances).  (Id. at 5516).  Once the court permitted the prosecutor to explain what Alabama law was regarding aggravating and mitigating circumstances, the members of McKinley's jury panel began to clarify their positions upon individual questioning by counsel and the court.  (Id. at

5519-5602).  Thus, when McKinley was questioned by counsel, she gave more detailed and nuanced answers, none of which indicated that she would always vote for the death penalty, regardless of the evidence.

Hall points to the following remarks that McKinley made during her individual voir dire testimony:

> I think if someone takes someone else's life, without cause, and just wanted to personally rob or kill, I – I really – I really do think that they deserve the death penalty ... I believe if someone goes in someone's home, breaks in on them and kills them for no reason, I mean, the lady wasn't bothering anyone or anyone else wasn't bothering someone, I would say – could say, give the death penalty, yes.

(Trial Transcript Vol. 33, p. 5554-55).  Defense counsel then asked McKinley,

> COUNSEL:  … In that situation, in the situation that you're talking about, someone was charged with intentional killing of someone, a resident in their home, during a burglary, you     are saying that you would impose the death penalty, is that correct?
>
> McKINLEY:  Yes.

(Id. at 5555).  Hall then claims that McKinley "further added that although she would listen to both sides, her view of the death penalty would not be changed."

(Doc. 1, p. 60).  However, this is not an entirely accurate characterization.  When defense counsel asked McKinley whether she would "take [her strong views on the death penalty] into the jury box," she answered that,

> I wouldn't say that I'd have the feeling with me. I'd have to hear everything before – you know, you've got to hear all the sides of anything because I don't know the story.  I mean, I'd have to hear it.

(Trial Transcript Vol. 33, p. 5557).    These answers do not establish that McKinley would always vote for the death penalty, automatically and regardless of evidence of mitigating circumstances.  Rather, these answers reveal a potential juror who strongly supported the death penalty but who indicated that she wanted to hear "everything" before voting on the appropriate penalty.  See id.

Reinforcing this view are additional portions of McKinely's voir dire testimony that Hall did not cite in his petition.  When asked by the prosecutor whether she would "automatically, in every case, vote for the death penalty," McKinley stated, "No, not unless I could hear, you know, both sides of everything …" (Trial Transcript Vol. 33, p. 5539).  When the prosecutor asked her whether she could consider both the aggravating factors and mitigating factors and weigh them before making a decision, McKinley stated, "I think so."  (Id.)

### (b)    Leroy Rogers

The second juror discussed in Hall's petition was Leroy Rogers, who Hall asserts "stated that he would always impose the death penalty for intentional murder regardless of the evidence." (Doc. 1, p. 61).  However, the court found no such statement from Rogers in the record.  Presumably, Hall imputes such a "statement" to Rogers based on the fact that all the jurors on Rogers' panel raised their hands when the trial judge asked who would always vote to impose the death penalty.  (Trial Transcript Vol. 33, p. 5512).  However, as explained above,  the transcript also shows that jurors raised their hands when asked if they could follow

Alabama law and weigh the aggravating and mitigating circumstances.  (Id. at 5513-16).  This led the trial court to explain to the panel that they could not answer "yes" to both questions.  (Id. at 5516).  Rogers was later questioned by the prosecutor on individual voir dire and affirmed that he would not automatically vote for the death penalty and that he would consider other mitigating factors such as the defendant's age or mental capacity before making a decision.  (Id. at 5529-30).

      **(c)    Juror Ann Chandler**

The third juror discussed in Hall's petition was Ann Chandler, who Hall asserts "stated that she would always impose the death penalty for intentional murder regardless of the evidence." (Doc. 1, p. 61).  However, as with Leroy Rogers, supra, the court found no such statement from Chandler in the record.  Presumably, Hall imputes such a "statement" to Chandler based on the fact that all the jurors on Chandler's panel raised their hands when the trial judge asked who would always vote to impose the death penalty.  (Trial Transcript Vol. 33, p. 5512).  As explained above, the transcript also shows that jurors also raised their hands when asked if they could follow Alabama law and weigh the aggravating and mitigating circumstances.  (Id. at 5513-16).  This led the trial court to explain to the panel that they could not answer "yes" to both questions.  (Id. at 5516).

Furthermore, at individual voir dire, Chandler admitted to having mixed feelings about the death penalty.  (Id. at 5530-31).  When the prosecutor asked her whether she would automatically vote for the death penalty upon a guilty verdict, she answered "[n]ot unless you – not unless I had, you know, all the circumstances

around it." (Id. at 5532).  Chandler also indicated that she could listen and consider Hall's background, family history, age, and mental capacity before making a decision about whether to vote for the death penalty, (id.), and would not automatically vote for a death sentence.  (Id. at 5535).

### (d)   Juror Donald Spencer

The fourth juror discussed in Hall's petition was Donald Spencer, who Hall also asserts "stated that he would always impose the death penalty for intentional murder regardless of the evidence." (Doc. 1, p. 61).  However, the court found no such statement from Spencer in the record.  As with Leroy Rogers and Ann Chandler, supra, Hall presumably imputes such a "statement" to Spencer based on the fact that all the jurors on Spencer's panel raised their hands when the trial judge asked who would always vote to impose the death penalty.  (Trial Transcript Vol. 33, p. 5512).  However, as explained above, the transcript also shows that jurors raised their hands when asked if they could follow Alabama law and weigh the aggravating and mitigating circumstances.  (Id. at 5513-16).  This led the trial court to explain to the panel that they could not answer "yes" to both questions.  (Id. at 5516).  In fact, at individual voir dire, Spencer stated that "I'm here to do the best job that I can do as a juror. Evidence, mitigating circumstances, would be all the factors that I would consider in imposing [the death penalty]." (Id. at p. 5546).

### (e)   Juror Keely "Tootie" Waters

The fifth juror discussed in Hall's petition was Keely "Tootie" Waters.  When questioned by the court at voir dire, Waters denied that she had a fixed opinion in

favor of capital punishment such that she would always impose the death penalty, regardless of the evidence produced.  (Trial Transcript Vol. 39, pp. 6725-26). Waters also affirmed that she could follow the law of Alabama and weigh the aggravating and mitigating circumstances before determining whether to recommend death or a life imprisonment without parole.  (Id.)  Hall nevertheless asserts that Waters' testimony shows that she could not have considered mitigating circumstances and that she would always vote for the death penalty if the victim was elderly.  (Doc. 1, p. 61).

The court's review of the record as cited by Hall does not support his claim. To be sure, Waters was a supporter of capital punishment.  When presented with a hypothetical question from defense counsel regarding whether it was "highly likely" that she would be inclined to vote for the death penalty for a person convicted of murdering an elderly person, Waters responded, "Yes, I would consider it."  (Trial Transcript Vol. 39, pp. 6769).  Waters also stated that it would be extremely difficult for her to be fair in the consideration of mitigating evidence once she had determined that the defendant was guilty of the murder of an elderly person.  (Id. at 6771).  When defense counsel asked Waters if "in [her] heart of hearts" she felt that someone who murdered an elderly person should get the death penalty, Waters replied, "I think so."  (Id. at 6772).  However, none of these answers negate Waters' testimony that she could apply the law of Alabama and weigh the mitigating and aggravating factors at the penalty phase of trial.  Waters' testimony may reflect that she would find this task difficult, but finding consideration of aggravating and

64

mitigating factors to be difficult does not equal outright refusal to consider them, and it does not establish that Waters would always vote for the death penalty, as alleged by Hall.  See Doc. 1, p. 61.

### (f)   Juror Diane Harrison

The sixth juror discussed in Hall's petition was Diane Harrison.  Hall asserts that Harrison "stated that she could not consider statutory mitigating circumstances, that Mr. Hall would have to take the stand and prove he was innocent and that she would impose the death penalty automatically for the killing of the elderly." (Doc. 1, p. 61).

The trial transcript is not as clear-cut as Hall implies in his petition.  Defense counsel asked Harrison if she would expect Hall to take the stand at a potential penalty phase of trial, to which she answered, "I sure would." (Trial Transcript Vol. 39, p. 6792).  However, in discussing whether she would require a defendant to present evidence, Harrison answered, "I wouldn't require him to, but, if he's got some defense, I'd love to hear it." (Trial Transcript Vol. 39, p. 6787-88).  Then, when asked whether she would consider imposing the death penalty upon a defendant who did not testify in his own defense, Harrison stated that she was "not sure." (Id. at 6788).  Finally, when the court asked Harrison whether she would "hold it against" the defendant if he did not testify, Harrison affirmed that she would be able to consider other evidence. (Id. at 6795).

Although Harrison's voir dire responses were ambivalent, they do not establish that she would refuse to consider aggravating and mitigating

65

circumstances, nor that Harrison would automatically vote for the death penalty. The trial court denied Hall's motion to strike Harrison for cause, and explained that the court felt defense counsel's explanations of the statutory mitigating factors to Harrison were "misleading or incomplete."  (Trial Transcript Vol. 40, p. 6842).   In other words, the trial court found that defense counsel had posed his questions to Harrison in such a way as to elicit pro-death penalty responses.  The trial court also found that "she stated she would consider ... all other types of mitigation."  Id.

### (g)   Juror Norman Barnett

The seventh juror discussed in Hall's petition is Norman Barnett.  Hall asserts that Barnett "knew a great deal about the case" and stated that "he would always vote for the death penalty for the murder of an elderly person."  (Doc. 1, pp. 61-62).

The portions of the trial transcript cited by Hall do not support his assertions, nor can this court can find any statement elsewhere in the record where Barnett indicated that he would always vote for the death penalty for the murder of an elderly person.  To the contrary, when defense counsel asked Barnett whether he would listen to mitigating evidence, Barnett replied unequivocally that, "I don't think I should be on the jury if I don't – if I don't listen to all the evidence."  (Trial Transcript Vol. 40, p. 6923).  And while Barnett admitted that he recalled reading about the Haskew murder in the local newspaper, he characterized his knowledge of the case as "general" and claimed not to recall the details of the case.  (Id. at 6932-34).  Barnett also denied that he had formed an opinion as to Hall's guilt or

66

innocence.  (Id. at 6938-39).  In short, nothing in the record suggests that Barnett was unable or unwilling to follow Alabama state law and consider aggravating and mitigating circumstances at the penalty phase of trial, nor does it contain any hint that Barnett would automatically vote for the death penalty.

### (h)   Juror Bennie Norris

The eighth and final juror discussed in Hall's petition was Bennie Norris. Hall asserts that Norris stated that "he would find Mr. Hall guilty if he did not testify and that he [Norris] believes life imprisonment without parole is 'a joke.'" (Doc. 1, p. 62).  However, Hall omits from his petition the fact that, after the trial court explained to Norris' jury panel what the legal burden of proof was in a criminal trial, as well as the Alabama law regarding aggravating and mitigating circumstances, Norris stated that he could follow Alabama law.  (Trial Transcript Vol. 41, p. 7087.).  Hall also fails to mention in his petition the fact that Norris stated, despite his strong belief in the utility of the death penalty, that after hearing the court explain the law regarding aggravating and mitigating circumstances, he "believed in" capital punishment and life imprisonment.  (Id. at 7093.)

### (2)   § 2254 Review

Hall made the same argument on direct appeal to the Alabama Court of Criminal Appeals as he makes in his petition – namely, that the trial court erred to reversal in denying his challenges for cause of the eight jurors discussed, supra. See Hall, 820 So.2d at 126.  The Court of Criminal Appeals reviewed the voir dire examination transcript and found no error, stating that the trial court "made every

attempt to ensure that each juror understood the questions before he or she gave an answer," and that "[e]ach of the challenged jurors unequivocally stated that he or she could follow the law as stated by the judge and could evaluate the case on the evidence presented at trial." Id. at 127.

In his habeas petition, Hall claims that the trial court's refusal to grant his strikes for cause violated Morgan, 504 U.S. at 729, in which the Supreme Court held that "a juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do," thus violating the Due Process Clause of the Fourteenth Amendment. Id. Hall also cites Eddings v. Oklahoma, 455 U.S. 104, 114 (1982) for the proposition that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, *as a matter of law*, any relevant mitigating evidence." (emphasis in the original). Yet the portions of the record cited by Hall do not establish or tend to prove that the challenged jurors would refuse to consider relevant mitigating evidence, nor that any of the challenged jurors would automatically vote for the death penalty. Thus, Hall has not shown that the trial court or the Alabama Court of Criminal Appeals decided the case in a manner contrary to or involving an unreasonable application of Morgan, Eddings, or any other U.S. Supreme Court determination of clearly established Federal law on point. Consequently, relief under §2254(d)(1) is inappropriate with regard to this claim. Furthermore, this court does not find that the state courts' decisions were

68

based upon an unreasonable determinations of the facts in light of the evidence presented in the trial court, making relief pursuant to §2254(d)(2) similarly inappropriate.

**CLAIM #7:  HALL'S CLAIM THAT THE TRIAL COURT FAILED  TO SUBMIT A VERDICT FORM THAT WOULD HAVE ALLOWED THE JURY TO VOTE FOR LIFE IMPRISONMENT, THEREBY DEPRIVING HALL OF A RELIABLE SENTENCE.**

Hall next argues that the trial court erred by not submitting a verdict form to the jury that would have allowed them to vote for life imprisonment if they determined that the State had failed to prove any aggravating circumstance.  (Doc. 1, p. 62).  Hall claims that this failure violated the U.S. Supreme Court's precedent contained in Mills v. Maryland, 486 U.S. 367 (1988), and Lockett v. Ohio, 438 U.S. 586, 605 (1978).

However, Mills and Lockett are not applicable to Hall's claim.  The critical circumstance in Mills centered around the possibility that jurors may have thought that unanimity was required in order to consider mitigating evidence.  Mills, 486 U.S. at 384.  Here, Hall does not argue that jurors were precluded from considering mitigating factors.[6]  Instead, Hall is focused on the jury's consideration of *aggravating* factors.

Similarly, Lockett stands for the proposition that states may not preclude "the sentencer, in all but the rarest kind of capital case … from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the

---

[6] Hall does make such an argument in Claim #14, which the court addresses, infra.

circumstances of the offense that the defendant proffers as a basis for a sentence less than death." <u>Lockett</u>, 438 U.S. at 605 (emphasis in the original).  Again, Hall has not argued in this claim that the jury was precluded from considering mitigating evidence or circumstances – his argument is that the verdict form required the jury to accept that at least one aggravating circumstance had been proven.[7]  <u>See</u> Doc. 1, p. 67.  Furthermore, as the Alabama Court of Criminal Appeals pointed out, " … by virtue of the fact that the jury found Hall guilty of burglary-murder, an aggravating circumstance was already found to exist as a matter of law, i.e., that the murder was committed during the course of a burglary, §13A-5-49(4)." <u>Hall</u>, 820 So.2d at 147.  Therefore, the verdict form appears to have been correct.

Accordingly, this court finds that Hall has failed to show that the state court decision on this issue was contrary to or involved an unreasonable application of clearly established federal law, as determined by the U.S. Supreme Court.  This court also finds that Hall has failed to show that the state court adjudication of this claim resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  <u>See</u> §2254(d)(1) and (2).

### CLAIM #8:  HALL'S CLAIM THAT THE TRIAL COURT VIOLATED HIS CONSTITUTIONAL RIGHTS BY FAILING TO SUPPRESS EVIDENCE

---

[7] Also not applicable to this claim are the cases listed in Hall's string citation of Supreme Court precedent cited on page 66 of the petition.  None of those cases discusses the particulars of the verdict form used, and none is on point regarding this specific issue.

**OBTAINED PURSUANT TO A SEARCH WHICH VIOLATED THE FOURTH
AND FOURTEENTH AMENDMENTS AND ALABAMA LAW.**

Hall also claims that the trial court erred when it denied his motion to suppress evidence obtained as a result of what he asserts to be an illegal search of the curtilage of Paula Shiver's house. (Doc. 1, p. 68). Specifically, Hall argues that the murder weapon and certain items taken from Mrs. Haskew's home, which were discovered in Haskew's stolen car parked behind a camper on Shiver's property, should have been suppressed because police did not have a search warrant to enter the curtilage of Shiver's property to check the license plate number of the car. (Id. at 69-70). Hall also argues that the trial court should have suppressed evidence seized from Hall and Wayne Travis after their arrest, for the same reasons. (Id. at 73).

The trial court denied Hall's motion to suppress, ruling that the search of the Shiver property was lawful. (Trial Transcript Vol. 43, p. 7544). Hall pressed the issue on direct appeal before the Alabama Court of Criminal Appeals, which ruled that Hall had no reasonable expectation of privacy in a stolen automobile and therefore had no standing to contest the constitutionality of the search. Hall, 820 So.2d at 133. The Alabama Supreme Court affirmed Hall's conviction without reference to this specific claim, but nevertheless found no reversible error in either the guilt or penalty phase of the trial. Hall, 820 So.2d 152.

Hall's claim must fail, for as the State has correctly pointed out, where a state prisoner has been provided an opportunity for full and fair litigation of a Fourth Amendment claim, he may not be granted federal habeas corpus relief on

the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.  Stone v. Powell, 428 U.S. 465, 494-95 (1976).  The Supreme Court has ruled that in the context of federal habeas corpus review, "the contribution of  the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force."  Id.

Hall argues in his reply brief that the Alabama Court of Criminal Appeals, by citing and quoting extensively from Ellison v. United States, 206 F.2d 476 (D.C. Cir. 1953), ignored the fact that the officers who found Mrs. Haskew's car "were not legally situated when they observed the facts necessary to determine the car was the fruit of a crime." (Doc. 33, p. 35).  He asserts that the court's reliance upon Ellison was "so erroneous that it is evident the courts did little more than rubber stamp the search," and that therefore, he was not provided a full and fair opportunity to litigate the matter and that federal review is not precluded by Stone, after all.  (Id. at 34).

This argument holds no water.  Hall has not argued that he had any legitimate expectation of privacy in the Shiver residence, nor has he proven that he had "an unrestricted right of occupancy or custody and control of the premises" that would create such a legitimate expectation of privacy in the area of the house where Mrs. Haskew's car was discovered.  See United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984).  Thus, there is no basis for Hall's argument that he was not provided a full and fair opportunity to litigate this issue, per Stone.

72

**CLAIM # 9:  HALL'S CLAIM THAT THE PROSECUTOR MADE IMPROPER AND PREJUDICIAL STATEMENTS TO THE MEDIA**

Hall next argues that habeas corpus relief is warranted because of "misleading and highly prejudicial comments" made by the prosecutor regarding Mrs. Haskew's murder and Hall's guilt.  (Doc. 1, p. 74).  Specifically, Hall claims that the local district attorney, Tommy Chapman, announced to the press within days of the murder that he believed Hall and co-defendant Travis were guilty and deserved to be executed.  Id.  Chapman also allegedly told the press that both Hall and Travis had criminal records, had mutilated the victim's body, and were devil worshipers.  Id.  By exposing the jury pool to his comments, Hall asserts, Chapman allegedly deprived Hall of his rights to due process, a fair trial, and an impartial jury .  Id.

For legal support, Hall points to the U.S. Supreme Court's opinions in Estes v. Texas, 381 U.S. 532, 540 (1965) and Sheppard v. Maxwell, 384 U.S. 333 (1966). Hall cites both cases for the proposition that he need not prove actual prejudice because, "at times a procedure employed by the State involves such a probability that prejudice will result that it is deemed inherently lacking in due process." Estes, 381 U.S. at 542-43.

 Unlike this case, though (and as noted, supra), the pretrial publicity at issue in Sheppard constituted a bona fide "carnival atmosphere,"  in which "newspapers and radio stations apparently interviewed prospective witnesses at will, and in many instances disclosed their testimony."  Sheppard, 384 U.S. at 359.  This "virulent publicity" of the Sheppard case included a three-day public inquest that

took place three months before trial, at which the defendant was subjected to questioning "for more than five hours without counsel … [and which] was televised live from a high school gymnasium seating hundreds of people," after which the inquest ended in a public brawl.  Id. at 354.

Similarly, in Estes, the pretrial hearings "were carried live by both radio and television, and news photography was permitted throughout."  Estes, 381 U.S. at 536.  The Supreme Court found that "the picture presented was not one of that judicial serenity and calm to which petitioner was entitled."  Id.

> "At least 12 cameramen were engaged in the courtroom throughout the hearing taking motion and still pictures and televising the proceedings. Cables and wires were snaked across the courtroom floor, three microphones were on the judge's bench and others were beamed at the jury box and the counsel table. It is conceded that the activities of the television crews and news photographers led to considerable disruption of the hearings. Moreover, veniremen had been summoned and were present in the courtroom during the entire hearing but were later released after petitioner's motion for continuance had been granted. The court also had the names of the witnesses called; some answered but the absence of others led to a continuance of the case …"

Id.

By contrast, Hall's trial saw nowhere near the same intensity of media coverage, despite his unsupported characterization of the Haskew murder as attended by a "community uproar and … onslaught of media attention unsurpassed in the history of Conecuh County."  (Doc. 1, p. 74)  Nor has Hall pointed to disputed claims made by the prosecutor in either Sheppard or Estes.

Hall also makes several assertions which upon closer inspection do not really amount to violations of his constitutional rights.  For example, Hall claims that the jury pool in his case was exposed to what he describes as "prejudicial pretrial information," (Doc. 1, p. 75); he claims that 49 of the 89 prospective jurors reported knowing about the case prior to trial, id.; he asserts that more than 25 prospective jurors knew that they had been called specifically for his trial after seeing their name on a list of jurors accompanying a detailed article about the case, id; and finally, Hall points out that the trial court denied many of his requests to strike jurors for cause.  Id.

Yet Hall fails to allege, and the record does not reflect, that any prospective jurors admitted at voir dire to having formed an opinion about Hall's guilt or innocence or acknowledged any familiarity with the material facts and circumstances of the case.  Furthermore, of the six motions to strike jurors for cause which Hall cited in his petition, none had anything to do with pre-trial publicity or prosecutor Chapman's comments to the news media.  See id.

Thus, keeping in mind the limited nature of federal habeas corpus review, this court cannot say that the facts of Hall's case are materially indistinguishable from the facts of Sheppard or Estes, nor that the state courts' adjudication of this issue was contrary to these two cases, or otherwise an unreasonable application of the principles set forth by the Supreme Court in either case.  This court also finds that the state court's decision was not an unreasonable determination of the facts.

Therefore, habeas relief pursuant to § 2254(d)(1) and § 2254(d)(2) is denied with regard to this issue.

**CLAIM #10:  HALL'S CLAIM THAT THE TRIAL COURT VIOLATED HALL'S RIGHT TO BE PRESENT DURING HIS TRIAL WHEN THE COURT CONDUCTED AN OFF-THE-RECORD HEARING OUTSIDE OF HIS PRESENCE.**

Hall claims that his Fifth Amendment Due Process rights and his rights under the Confrontation Clause of the Sixth Amendment were violated when the trial judge allegedly concluded the oral argument for Hall's motion to dismiss the indictment in-chambers, outside of Hall's presence.  (Doc. 1, p. 78).  Hall further alleges that the trial judge returned from the in-chambers hearing and "summarily denied his motions without explanation."  Id.

This court notes at the outset that Hall's characterization of the trial judge's in-chambers hearing is at odds with the record.  See Trial Transcript Vol. 44, pp. 7796-7800 and Trial Transcript Vol. 45, pp. 7801-7803.  The record reflects clearly that defense counsel argued his motions before the trial judge in open court before the judge adjourned to his chambers with defense counsel and the prosecutor to listen to the taped testimony of the medical examiner.  (Trial Transcript Vol. 45, p. 7801).  Upon returning from the short recess, the trial judge made a point of stating that "[l]et me note for the record that during the argument, the Court adjourned to chambers to listen to the tape of Dr. Gregory Wanger, made no rulings or took no action while in chambers.  Counsel for the State and Defense did accompany me and were able to listen to the tape at the same time the Court did."  Id. at 7801-02.  The trial judge then asked defense counsel if he wished to make any further argument

before denying Hall's motion to dismiss and for judgment of acquittal.  Id. at 7802.

Nothing in the record suggests that the hearing on Hall's motions was concluded in

the trial judge's chambers, as Hall claims.

   Setting aside the fact that the record does not support Hall's

characterization, the U.S. Supreme Court precedent cited by Hall does not support

his position.  The question considered by the Supreme Court in Kentucky v. Stincer,

482 U.S. 730 (1987) was whether the defendant's due process rights were violated

by his exclusion from a competency hearing where no substantive testimony was

elicited.  Stincer, 482 U.S. at 745.  The court reasoned that the defendant's rights

were not violated because the defendant gave no indication that his presence at the

hearing "would have been useful in ensuring a more reliable determination as to

whether the witnesses [were] competent to testify."  Id. at 747.  Stated differently,

the defendant "presented no evidence that his relationship with the [witnesses], or

his knowledge of facts regarding their background, could have assisted either his

counsel or the judge in asking questions that would have resulted in a more assured

determination of competency."  Id.  Here, Hall has also not presented evidence

suggesting that his presence in the trial judge's chambers would have resulted "in a

more assured determination" of his motions.  So, even if the record supported Hall's

claim, there is nothing in Stincer that runs contrary to the state courts' adjudication

of his motion to dismiss the indictment and for judgment of acquittal.

   Similarly inapposite is the Supreme Court's ruling in Illinois v. Allen, 397

U.S. 337, 338 (1970).  The question presented in Allen was "whether an accused can

claim the benefit of this constitutional right to remain in the courtroom while at the same time he engages in speech and conduct which is so noisy, disorderly, and disruptive that it is exceedingly difficult or wholly impossible to carry on the trial." Allen, 397 U.S. at 338.   The Court answered this question in the negative, holding that "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." Id. at 343.   Nevertheless, as there was no indication that Hall was disruptive or disrespectful of the court at trial, nor that he was removed from the courtroom, Allen is of no utility.

Finally, Hall's citation of Johnson v. Zerbst, 304 U.S. 458, 464 (1938), does not further his argument because Johnson dealt with whether the defendant had waived his Sixth Amendment right to counsel, and tells this court nothing about a defendant's rights under the Sixth Amendment's Confrontation Clause.  Id. at 464-65.

Accordingly, relief pursuant to §2254 is not appropriate with respect to this claim.

### CLAIMS #11 THROUGH 13:     PROSECUTORIAL MISCONDUCT

### CLAIM #11:             PROSECUTOR'S CALL TO "SEND A MESSAGE"

Hall argues that, at closing arguments, the prosecutor improperly urged the jury to find Hall guilty in order to "send a message out to Monroe County." (Doc. 1, p. 78) (quoting Trial Transcript Vol. 45, p. 7866).  Defense counsel immediately

objected to the prosecutor's statement, and the trial court gave the jury a curative

instruction, telling the jurors that "your function in this case is to do justice, to

resolve the issues in the case, not to send any messages."  (Trial Transcript Vol. 45,

pp. 7866-67).  Continuing with his closing argument, the prosecutor said:

> Each and every one of us have a right to be safe in our
> homes. To be safe. It is said somewhere that a home is
> your castle.  And you have a right to be safe therein.  If
> elderly women, whose husbands have passed away and
> whose children have moved away, do not have a right to
> be safe in our home, against this kind of intrusion, then
> we don't have a safe world to live in.
>
> To not convict this man of capital murder would be saying
> to him it's okay.  It's okay.  He deserves to be convicted of
> capital murder because the evidence in this case says that
> he's guilty.  And he deserves to be convicted of capital
> murder because I intend to come back here, after you do
> that, and ask you to give him the death penalty.

(Trial Transcript Vol. 45, pp. 7867-68).  Immediately after the prosecutor concluded

his closing argument, the court told the jury, sua sponte, that "punishment has no

part in your decision here.  We're here in this part of the trial to decide the issues of

guilt or innocence."  Id. at 7868.

Hall now argues that the prosecutor's comments require reversal of his

conviction because "they were calculated to distract and inflame the jury in

violation of state and federal law."  (Doc. 1, p. 79).  This is an unreasonable stretch.

The trial court promptly sustained defense counsel's objections to the comments in

question, gave one curative instruction to the jury immediately upon defense

counsel's request, and gave a second curative instruction on its own initiative.

(Trial Transcript Vol. 45, pp. 7866-7868).  Although Hall cites <u>In re Winship</u>, 397 U.S. 358, 364 (1970), for support, the facts of that case bear no resemblance to the facts of Hall's case.  The cited portion of <u>Winship</u> merely recites the importance of the reasonable-doubt standard in American criminal jurisprudence, and Hall makes no attempt to tie the facts of that case to his own.  <u>See</u> Doc. 1, p. 78.  Hall's citation of <u>Francis v. Franklin</u>, 471 U.S. 307, 313 (1985), is similarly unhelpful because the Court in that case was focused on the nature of certain presumptions contained in jury instructions, and not the content of the State's closing argument.  <u>See</u> <u>id.</u>

In other words, there is nothing to this claim that was contrary to, or an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court.  Likewise, this court does not find that the state courts' decisions resulted in an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim cannot be the basis of a writ of habeas corpus under § 2254(d)(1) or § 2254(d)(2).

## <u>CLAIM #12</u>:         **DISPARAGING REMARKS ABOUT HALL'S ATTORNEYS AND DEFENSE.**

Hall objects to a different part of the state's closing argument wherein the prosecutor discussed Hall's defense that he was in McKenzie, Alabama, because the father of co-defendant Wayne Travis had asked Hall to help Travis overcome his addiction to sniffing gasoline.  (Trial Transcript Vol. 45, pp. 7860-61).  The prosecutor argued that this defense was a "smoke screen" with no evidentiary basis which the jury should contrast with the State's case, saying "[t]hese things that I'm talking to you about are evidence in this case."  <u>Id.</u>  Hall did not object at trial to the

80

prosecutor's statement, but now argues that these comments constitute prosecutorial misconduct that "so infected Mr. Hall's trial with unfairness as to render his trial fundamentally unfair and result in denial of due process." (Doc. 1, p. 81). Hall goes so far as to say that "[t]he prosecutor's comments punished Mr. Hall for having the audacity to retain counsel and for challenging the State's evidence ..." Id. at 83.

There is no doubt that "assertions calculated to mislead or inflame the jury's passions are forbidden in the presentation of closing arguments." United States v. Lopez, 590 F.3d 1238, 1256 (11th Cir. 2009). But the particular comments made here are not the stuff of a federal constitutional violation. None of the U.S. Supreme Court cases cited by Hall supports his argument on this point. In fact, Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974) weighs against Hall's argument insofar as the Supreme Court ruled that the prosecutor's remark was "but one moment in an extended trial," and finding that "the process of constitutional line drawing in this regard is necessarily imprecise ..."

Likewise, Berger v. United States, 295 U.S. 78 (1935), does not support Hall's argument because of the stark contrast between the facts of the two cases. The Berger court determined that the prosecutor made "improper insinuations and assertions calculated to mislead the jury." Id. at 88. In this case, there is no suggestion that the prosecutor's "smokescreen" comments were similarly calculated to mislead.

81

Finally, the Supreme Court in <u>Darden v. Wainwright</u>, 477 U.S. 168, 181-82 (1986), held that the prosecutor's improper closing argument did not deprive the defendant of a fair trial because the comments in question "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent."  The same can be said for the prosecutor's "smokescreen" comment, which, while somewhat argumentative, simply does not rise to the level of a deprivation of due process rights as defined by the United States Supreme Court.  The Alabama Court of Criminal Appeals framed the issue concisely and appropriately when it cited its opinion in <u>Thomas v. State</u>, 393 So.2d 504 (Ala.Cr.App. 1981), " '(A) trial is a legal battle, a combat in a sense, and not a parlor social affair.' " (<u>quoting</u> <u>Arant v. State</u>, 232 Ala. 275 (1936)).

Accordingly, this court finds that the Alabama Court of Criminal Appeals did not unreasonably apply any principle of federal law on direct appeal in rejecting this aspect of Hall's claim of prosecutorial misconduct.  Nor does the court find that the state court decision resulted in an unreasonable determination of the facts in light of the evidence presented.

### <u>CLAIM #13(A)</u>:   ALLEGED CREATION OF FACTS TO "PLUG HOLES" IN THE STATE'S CASE AND EXAGGERATE THE BRUTALITY OF THE CRIME.

Next, Hall claims that "some facts in the record" suggested that he lacked an intent to kill Mrs. Haskew, and, in an effort to overcome these facts (which Hall never identifies in his petition), the prosecutor "created facts to suggest that the murder was premeditated."  (Doc. 1, pp. 84-85).

Specifically, Hall points to the following: at closing argument, the prosecutor summarized the testimony of Mrs. Haskew's neighbor, Nellie Schad, regarding the murder weapon.  According to the prosecutor, Schad had identified the gun as hers, and testified that it had been stolen in a burglary on the same night that Mrs. Haskew was killed.  (Trial Transcript Vol. 45, Tab R-24, p. 7856).  In fact, what Schad actually stated in court was that the murder weapon "looks very much like the gun that was in my house."  (Trial Transcript Vol. 42, p. 7323).  Nellie Schad's ex-husband, Ed Schad, later testified that the murder weapon was the same make and caliber as the gun stolen from Nellie's house.  (Id. at 7327).  However, when Ed Schad read the serial number from the bill of sale for the gun into evidence, one number was different from the serial number on the stock of the murder weapon. (Id. at 7330).  Hall concludes that "contrary to the prosecutor's argument, the weapon used to kill Mrs. Haskew did not match the gun removed from Ms. Schad's home."  (Doc. 1, p. 85).  Hall also asserts that "[t]he prosecutor … created facts to make the crime appear more abhorrent than it actually was" by stating to the jury that Mrs. Haskew's jaw had been broken.  (Id.)  In fact, the medical examiner did not testify (and the autopsy report did not state) that Mrs. Haskew's jaw, specifically, had been broken.  (Trial Transcript Vol. 43, pp. 7452-7468 and Trial Transcript Vol. 4, pp. 666-69).

Hall cites three cases from the Eleventh Circuit, but only one U.S. Supreme Court case, Berger v. U.S., 295 U.S. at 84-89, for the proposition that "arguing facts outside of the record is strictly forbidden because it misleads the jury, ... thereby

lessening the burden of proof." (Doc. 1, p. 86). Yet the facts in <u>Berger</u> are
materially distinguishable from this case, because the prosecutorial misconduct at
issue in <u>Berger</u> is not comparable to the claims Hall makes here. The <u>Berger</u> court
described the prosecutor's misdeeds in that case as being "undignified and
intemperate, containing improper insinuations and assertions calculated to mislead
the jury." <u>Berger</u>, 295 U.S. at 85. By comparison, prosecutor Chapman's comment
at closing arguments cannot reasonably be said to have been calculated to mislead
the jury, for even without the serial number from the murder weapon and without a
definitive identification of the gun by Ms. Schad, the evidence already tended to
show that the gun recovered from Mrs. Haskew's stolen car was the same gun
stolen from the Schads' house because it was discovered with other items taken
from their home.[8] <u>Hall</u>, 820 So.2d at 141.

　　　With regard to the prosecutor's allegedly exaggerating the brutality of the
crime, this court agrees with the Alabama Court of Criminal Appeals insofar as it
"[fails] to see how any prosecutor could exaggerate the brutality of this murder."
Despite the prosecutor's erroneous statement that Mrs. Haskew's jaw had been
broken, the jury nevertheless heard testimony and saw photographic and video
evidence of the horrific injuries resulting from the beating that she suffered at the
hands of Travis and Hall, including "[a] blue contusion … along the angle of the
right jaw." (Trial Transcript Vol. 4, p. 666). This constituted graphic evidence of

---

[8] It is also worth noting that defense counsel initially objected to the introduction of the
murder weapon's serial number into evidence, stating that "[t]here's no evidence as to the
uniqueness of serial numbers." (Trial Transcript Vol. 42, p. 7329).

the brutality of the crime, to say nothing of the multiple gunshot wounds to the head.

In short, there is nothing in Hall's claim which suggests that the trial court or state courts of appeal decided his case differently than the United States Supreme Court on a set of materially indistinguishable facts, nor that the state courts unreasonably applied the correct governing principle to the facts of Hall's case, pursuant to § 2254(d)(1).  Nor is there anything in Hall's claim to suggest that the state court decisions resulted in an unreasonable determination of the facts in light of the evidence presented, pursuant to § 2254(d)(2).

### CLAIM #13(B):     ALLEGED MISSTATEMENT OF LAW REGARDING THE STATE'S BURDEN OF PROVING HALL'S GUILT BEYOND A REASONABLE DOUBT

Hall next claims that the prosecutor misstated the law when he told the jury that a reasonable doubt was "a doubt for which you can give a particular reason after considering all of the evidence."  (Trial Transcript Vol. 45, p. 7835-36).  Hall argues that such a definition was flawed because "it required the jury to be capable of articulating a 'particular reason' before voting for acquittal."  (Doc. 1, p. 87).  Hall further claims that the prosecutor's statement violated his rights pursuant to the U.S. Supreme Court holdings in In re Winship, 397 U.S. 358 (1970) and Victor v. Nebraska, 511 U.S. 1, 6 (1994), because the statement "improperly suggested that even if the State's proof had not persuaded a juror, the resulting doubt would not be regarded as 'reasonable' unless the juror could also articulate the reason for having it." (Doc. 1, p. 87).

Hall's claim must fail because, as the Alabama Court of Criminal Appeals noted, the trial court appropriately instructed the jury on the concept of reasonable doubt. Hall, 820 So.2d at 142. The definition of reasonable doubt that the trial court gave to the jury was as follows:

> The phrase reasonable doubt is self-explanatory. Efforts to define it do not always clarify the term. But, it may help to know that it is not a mere possible doubt. Everything relating to human affairs is open to some possible or imaginary doubt. A reasonable doubt is a doubt of a fair-minded juror, honestly seeking the truth after careful and impartial consideration of all the evidence in the case. It's a doubt based upon reason and common sense. It does not mean a vague or arbitrary notion, but, is an actual doubt based upon the evidence, a part of the evidence, a lack of evidence, a conflict in the evidence or a combination of those factors. It is a doubt that remains after going over, in your minds, the entire case and giving consideration to all the testimony. It's distinguished from mere possibility, from bare imagination or from fanciful conjecture.

(Trial Transcript Vol. 45, pp. 7888-7890). The trial court also instructed the jury that "no statements or arguments of the attorneys constitute proof. The proof is in the testimony of witnesses and exhibits which have been admitted in the case." Id. at 7896.

In light of the trial court's detailed instructions to the jury regarding reasonable doubt and the non-evidentiary value of statements from the attorneys, the court cannot say that Hall's case violates or unreasonably applies the U.S. Supreme Court's rule in In re Winship, 397 U.S. at 364, which merely states the indispensability of the reasonable doubt standard. Nor was the prosecutor's comment indistinguishable from the offending jury instruction on reasonable doubt

86

at issue in <u>Victor v. Nebraska</u>, 511 U.S. 1, 6 (1994).   To the contrary, the

prosecutor's comment about reasonable doubt did not "so infect the trial with

unfairness" as to warrant relief under § 2254(d)(1) or § 2254(d)(2).  <u>See</u> <u>Darden</u>, 477

U.S. at 181.

### CLAIM #13 (C):    ALLEGED PENALTY PHASE MISCONDUCT

    **(a)**    **ALLEGATION THAT THE PROSECUTOR TOLD THE JURY TO PRESUME THAT THE DEATH PENALTY WAS THE APPROPRIATE PENALTY.**

On two separate occasions during voir dire, the prosecutor was asked by

members of the jury panel to explain the concept of mitigating circumstances.

(Trial Transcript Vol. 38, pp. 6415-16 and Trial Transcript Vol. 41, pp. 7181-7183).

The prosecutor explained that, in pertinent part, "[m]itigating is something that

would tend to make a juror not vote for the death penalty," <u>id.</u> at 6416, and

"[m]itigating circumstances are … those things why you shouldn't give the death

penalty, why you should consider and weigh this out and decide on maybe a life

without parole." <u>Id.</u> at 7182-83.

Later, at closing arguments, the prosecutor told the jury that, "the law has a

way of dealing with people who are evil, who are cruel, who will take a defenseless,

pitiful, harmless, sixty-nine year-old woman and beat her and drag her… And that's

the death penalty." (Trial Transcript Vol. 47, pp. 8270-71).

Hall objects both to the prosecutor's definition of mitigating circumstances

and his statement at closing argument as implying to the jury that "a presumption

favoring the death penalty exists which must be rebutted by the defendant." (Doc.

1, p. 88).  Hall further alleges that such an implication by the prosecutor denied him the individualized sentencing guaranteed under the Constitution and as discussed by the U.S. Supreme Court in Hitchcock v. Dugger, 481 U.S. 393, 398-99 (1987), Eddings v. Oklahoma, 455 U.S. 104, 110 (1982), and Lockett v. Ohio, 438 U.S. 586, 605 (1978).

   This court fails to see how the prosecutor's statements at voir dire and during closing arguments imply a presumption in favor of the death penalty.  The definition offered by the prosecutor is not substantively different from that which the trial court gave to the jury when it instructed them before the penalty phase deliberations, which was "any circumstance that indicates or tends to indicate that the Defendant should be sentenced to life imprisonment without parole instead of death."  (Trial Transcript Vol. 47, p. 8276).

   Furthermore, none of the cases cited by Hall support his argument on this point.  In Hitchcock, the issue surrounding mitigating circumstances was whether the jury had been instructed to limit consideration of mitigating factors to those enumerated in the statute (as opposed to non-statutory mitigating factors).  Hitchcock, 481 U.S. at 398-99.  In this case, Hall has not cited any comments made by the prosecutor regarding statutory versus non-statutory mitigating factors.  There is also nothing to support Hall's claim contained in Lockett or Eddings, because both cases merely reaffirmed that a sentencer in capital cases "must be permitted to consider any relevant mitigating factor," recognizing that "justice … requires … that there be taken into account the circumstances of the offense

together with the character and propensities of the offender." <u>Eddings</u>, 455 U.S. at 112 (quoting <u>Pennsylvania v. Ashe</u>, 302 U.S. 55, 55 (1937)).  Hall's claim does not allege that the prosecutor or the trial court made any statement or gave any instruction which directed the jury to refrain from considering mitigating factors.

This court therefore finds that no grounds exist for granting Hall's petition on this claim under § 2254(d)(1) or § 2254(d)(2).

**(b)    ALLEGATION THAT THE PROSECUTOR  URGED THE JURY TO VOTE FO THE DEATH PENALTY UPON NON-STATUTORY AGGRAVATING CIRCUMSTANCES**

Hall next argues that the prosecutor at Hall's trial improperly argued in favor of the death penalty based upon non-statutory aggravating factors when he said, "What kind of break did [Hall and co-defendant Travis] give Clarene Haskew. What kinds of break did they give this sixty-nine year old woman who had fought two brain tumors, who, on her birthday, only wanted to be with her family, to retire that night peacefully in her country home." (Trial Transcript Vol. 47, p. 8265).  In remarking upon Mrs. Haskew's age and health, Hall contends, the prosecutor "directly encouraged the jury to consider these facts in aggravation of the crime …" (Doc. 1, p. 91).

The sole U.S. Supreme Court authority that Hall cites, <u>Sochor v. Florida</u>, 504 U.S. 527 (1992), cannot be the basis for granting habeas relief because the petitioner's claim in <u>Sochor</u> centered around a jury instruction delivered by the trial court, whereas Hall disputes a statement made by the prosecutor at closing argument.  Thus, it cannot reasonably be said that the Alabama Court of Criminal

Appeals decided Hall's case differently than the U.S. Supreme Court on a set of materially indistinguishable facts, precluding relief pursuant to § 2254(d)(1).

This court also finds that the trial court adequately instructed the jury on the statutory aggravating factors under Alabama law.  (Trial Transcript Vol. 47, pp. 8277-8284).  Therefore, this court finds that the decision of the Alabama Court of Criminal Appeals in denying Hall's direct appeal did not result in an objectively unreasonable factual determination, precluding relief pursuant to § 2254(d)(2).

**CLAIM #14:  HALL'S CLAIM THAT THE TRIAL COURT DEPRIVED HALL OF A RELIABLE SENTENCING HEARING WHEN IT FAILED TO INSTRUCT THE  JURY THAT UNANIMITY IS NOT REQUIRED TO FIND THE EXISTENCE OF A MITIGATING CIRCUMSTANCE.**

Hall claims that the trial court failed to instruct the jury that it need not be unanimous to find the existence of a mitigating circumstance, and then implied that such unanimity was required "by repeatedly referring to the jury collectively (i.e., 'the jury,' 'you,' 'your').  (Doc. 1, p. 92).  This alleged failure, Hall argues, led to the "substantial possibility" that the jury believed unanimity was necessary, thus requiring reversal of Hall's conviction and sentence pursuant to the U.S. Supreme Court's opinion in Mills v. Maryland, 486 U.S. 367, 383 (1988).  Id.

The court notes at the outset that the jury instructions of which Hall complains in this claim pertained only to the sentencing phase of trial.  (Doc. 1, p. 92).  So, even if this Claim #14 had merit, which it does not, it would implicate only Hall's death sentence and not his first-degree murder conviction.  That being said, Hall's claim fails because the trial court's instructions did not say or imply that the jury must determine the existence of each individual mitigating factor unanimously.

(Trial Transcript Vol. 47, pp. 8289-8295).   Neither the instructions nor the verdict forms said anything about how—or even whether—the jury should make individual determinations that each particular mitigating circumstance existed -- rather, they focused only on the overall balancing question.

Also weighing against Hall's argument is the fact that the trial court instructed the jury repeatedly that they must unanimously determine the existence of each aggravating factor.  Id. at 8295, 8300, 8314.  The fact that the trial judge specified a unanimity requirement with regard to aggravating circumstances, but not with regard to mitigating circumstances, suggests that the jurors did not mistakenly think that they were required to unanimously find a mitigating circumstance.

Thus, the instructions and verdict forms did not clearly bring about, either through what they said or what they implied, the circumstance that Mills found critical, namely,

> a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance.

486 U.S. at 384.  It also bears noting that the Supreme Court has held that a state court's decision to uphold such forms and instructions is not "contrary to, or ... an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" in Mills.  Smith v. Spisak, 130 S. Ct. 676, 684 (2010) (quoting 28 U.S.C. § 2254(d)(1)).

Thus, for these reasons, habeas relief is not appropriate upon this claim under § 2254(d)(1), nor under § 2254(d)(2).

## CLAIM #15:  HALL'S CLAIM THAT THE TRIAL COURT'S  INSTRUCTION ON THE AGGRAVATING CIRCUMSTANCE THAT THE CAPITAL OFFENSE  WAS ESPECIALLY HEINOUS, ATROCIOUS, OR CRUEL VIOLATED HALL'S CONSTITUTIONAL RIGHTS.

Hall alleges in his next claim that the trial court's jury instruction on the "heinous, atrocious, or cruel" aggravating circumstance was constitutionally flawed because the trial court defined the aggravating circumstance disjunctively (i.e., "heinous, atrocious, *or* cruel" rather than "heinous, atrocious, *and* cruel), which may have led the jury to believe that the aggravating circumstance existed "even if it found that the crime was only heinous, only atrocious, or only cruel."  (Doc. 1, p. 94). Hall also argues that the trial court's instruction failed to inform the jury that it was required to unanimously agree upon all three elements of the aggravating circumstance, id., and claims that the instruction was vague because the terms "heinous" and "atrocious" are redundant.  Id.

For support, Hall cites the U.S. Supreme Court case of Maynard v. Cartwright, 486 U.S. 356 (1988), where the Court found the nearly-identical Oklahoma statutory aggravating circumstance to be unconstitutionally vague under the Eighth Amendment.  Due to the similarity of the Alabama statute to the one at issue in Maynard, Hall argues that the same standard applies to his case and warrants habeas corpus relief.

Hall's case is distinguishable from Maynard, however, because in Maynard, the jury (which was the sentencing authority in Oklahoma) was instructed solely in

92

the words of the statute, without any instructions as to what these words meant in the context of a capital crime or what facts would justify a finding of the aggravating circumstance.  <u>Maynard</u>, 486 U.S. at 360.  This led the U.S. Supreme Court to hold that the words of the aggravating circumstance themselves give little guidance as to what facts are applicable and that, when the jury is given no limiting instructions and the appellate court does not declare any standard by which it is reviewing the finding, the aggravating circumstance as applied in that case is unconstitutional.  <u>Id.</u> at 363-64.  The U.S. Supreme Court indicated that it was not prescribing any particular construction of the aggravating circumstance; it only required that it be limited in some meaningful way.  <u>Id.</u> at 365-66.

      <u>Maynard</u> is, in effect, a restatement of the holding in <u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980), which the U.S. Supreme Court found controlling in <u>Maynard</u>, and which Hall also cites in support of his argument on this point.  In <u>Godfrey</u>, the Court dealt with a somewhat similar aggravating circumstance, i.e., that the offense "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim."  <u>Godfrey</u>, 446 U.S. at 422. As was the case in <u>Maynard</u>, the jury was merely read the statutory language with no explanatory instructions.  <u>Godfrey</u>, 446 U.S. at 426.  The Georgia Supreme Court affirmed the finding of the aggravating circumstance without discussing any standard for its review.  <u>Id.</u> at 426-27.  The U.S. Supreme Court reversed, holding that a capital sentence scheme must channel the sentencer's discretion by clear and objective standards and must provide a meaningful basis for distinguishing cases in

which the death penalty should be imposed from those in which it should not.  Id. at 427-29.  The Godfrey court held that the failure to instruct the jury beyond the words of the statute was not cured by the review of the Georgia Supreme Court because, like the state appellate court in Maynard, the Georgia Supreme Court pronounced no standard for judging the existence of this aggravating circumstance. Id. at 429.

In Hall's case however, unlike Maynard and Godfrey, the jury was instructed on the meaning of the words contained in the aggravating circumstance.  (Trial Transcript Vol. 47, pp. 8281-83).  These instructions correctly followed the previously recognized limiting construction of the aggravating circumstance established by the Alabama Supreme Court in Ex parte Kyzer, 399 So.2d 330, 334 (Ala. 1981), wherein the court stated, "[t]he aggravating circumstance listed in s 13-11-6(8) [now § 13A-5-49(8) ] was intended to apply to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."  In defining the circumstances under which the aggravating circumstance could be applied, the Alabama Supreme Court expressly followed Godfrey.  Id., see also Ex parte Deardorff, 6 So.3d 1235, 1240 (Ala. 2008).

Therefore, the "heinous, atrocious, or cruel" aggravating circumstance articulated to the jury by the trial court in the instant case was not unconstitutionally vague under the Eighth Amendment.  Because Hall has not identified any other U.S. Supreme Court precedent to support this claim, habeas

94

corpus relief is not warranted on this particular claim under either § 2254(d)(1) or § 2254(d)(2).

### CLAIM #16:  HALL'S CLAIM THAT THE PROSECUTOR FAILED TO PROVE THE AGGRAVATING CIRCUMSTANCE THAT THE CRIME WAS HEINOUS, ATROCIOUS, OR CRUEL WHEN COMPARED TO OTHER CAPITAL OFFENSES.

Hall next claims that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the U.S. Constitution were violated because the state did not introduce any evidence of comparative crimes at the sentencing phase of trial, despite the fact that one of the aggravating circumstances found to exist was that "[t]he capital offense was especially heinous, atrocious, or cruel compared to other capital offenses." (Doc. 1, p. 96) (quoting ALA. CODE § 13A-5-49) (emphasis added).  Hall argues that without evidence of comparative crimes, the jury had no basis for finding this aggravating circumstance.  (Id.)

This claim is a nullity from a habeas corpus point of view.  The court notes that Hall failed to cited any U.S. Supreme Court precedent whatsoever in his petition, and therefore, this court cannot say that the state found differently than the Supreme Court on a set of materially indistinguishable facts or otherwise unreasonably applied a governing principle from such precedent to the instant case. Although Hall later cited Oregon v. Ice, 555 U.S. 160, in his reply brief (see Doc. 33, p. 45),  that case is vastly distinguishable from Hall's.  For one thing, Ice is not a death penalty case.  Secondly, the Ice court held that the Sixth Amendment does not inhibit states from assigning to judges, rather than juries, the task of finding facts necessary to impose consecutive sentences for multiple offenses (rather than

95

concurrent sentences).  Id. at 164.  This holding does not further Hall's argument in the least.

Similarly unavailing is Hall's reply brief citation of In re Winship, 397 U.S. 358 (1970).[9]  Winship, which is also not a death penalty case, stands for the proposition that juveniles are constitutionally entitled to the reasonable doubt standard when they are charged with a violation of criminal law, and does not establish that § 2254(d)(1) relief is appropriate in this case.

Hall also failed to cite any fact or authority which would support even an implicit argument that the state court adjudication resulted in an unreasonable decision in light of the evidence produced.  Therefore, habeas corpus relief is not appropriate under § 2254(d)(2).

### CLAIM #17:  HALL'S CLAIM THAT THE TRIAL COURT ERRED IN ALLOWING EVIDENCE OF A PRIOR CRIME THAT WAS NOT CHARGED IN THE INDICTMENT TO BE ADMITTED DURING HIS TRIAL

Hall next claims that the trial court erred when it admitted evidence suggesting that Hall and his co-defendant, Wayne Travis, burglarized Nellie Schad's home on the night of Mrs. Haskew's murder.  (Doc. 1, p. 97).  Hall argues that evidence of this burglary was inadmissible because it pertained to an extrinsic crime not specifically charged in the indictment.  Id.

The court notes that, as with claim #16 above, Hall did not cite any U.S. Supreme Court precedent in his petition, nor otherwise alleged or showed that the state court adjudication was unreasonable in light of the evidence presented.

---

[9] The court notes that Hall did not cite any specific page or portion of Winship.

Therefore, habeas corpus relief is not appropriate under either §2254(d)(1) or § 2254(d)(2).

**CLAIM #18:  HALL'S CLAIM THAT THE TRIAL COURT VIOLATED HIS RIGHT TO A RELIABLE SENTENCE WHEN IT DENIED HIM THE BENEFIT OF A STATUTORY MITIGATING CIRCUMSTANCE BASED UPON ITS ERRONEOUS CALCULATION OF HIS AGE AT THE TIME OF THE CRIME.**

Hall next argues that the trial court miscalculated his age when it imposed a death sentence, finding that Hall was twenty-two years old when in fact he was twenty-one years old at the time of Mrs. Haskew's murder.  (Doc. 1, p. 99).  Thus, Hall contends that the court erred when it concluded that Hall's age at the time of the crime was not a mitigating circumstance.  (Id.)  Hall cites Eddings, 455 U.S. at 110, and Lockett, 438 U.S. at 606-07, for support.

However, there is nothing to support Hall's claim in either Lockett or Eddings, because those cases merely require that a sentencer in capital cases be permitted to consider any relevant mitigating factor.  Eddings, 455 U.S. at 110. Here, there is no indication that the trial court was prevented from considering or refused to consider Hall's age as a mitigating factor.  Instead, the record reflects that during the sentencing hearing, the trial judge misstated Hall's age as twenty-two instead of twenty-one years old.  (Trial Transcript Vol. 48, p, 8528).  The Alabama Supreme Court noted that Hall's correct date of birth was stated in his presentence report, Hall, 820 So.2d at 150, which although not conclusive, does tend to suggest that the trial court considered Hall's correct age when determining his sentence.

97

In any event, the defendant in <u>Eddings</u> was sixteen when he committed the crime for which he was sentenced to death, making him a minor, unlike Hall, who was an adult.  <u>See</u> <u>Eddings</u>, 455 U.S. at 105.  The defendant in <u>Lockett</u>, on the other hand, was twenty-one when she committed the crime for which she was sentenced to death; however, the U.S. Supreme Court reversed her death sentence on the basis that the Ohio statute under which she was sentenced did not permit the judge to take her age or other potentially mitigating factors into account.  There is no suggestion that the Alabama statute limited the trial judge in this way.  Therefore, both <u>Eddings</u> and <u>Lockett</u>, present materially distinguishable facts from Hall's case, and there is nothing to suggest that the Alabama state courts unreasonably applied a governing principle from either <u>Eddings</u> or <u>Lockett</u>, or arrived at an unreasonable determination of the facts in light of the evidence presented.  Accordingly, habeas corpus relief pursuant to §2254(d)(1) and §2254(d)(2) is inappropriate for this claim.

### CLAIM #19:  HALL'S CLAIM THAT THE TRIAL COURT REFUSED TO SUPPLEMENT ALLEGEDLY CRITICAL PORTIONS OF THE RECORD

Hall also claims that the trial court "adversely affected" Hall's Fifth, Sixth, Eighth, and Fourteenth Amendment rights when it refused to supplement the record with audiotapes of the voir dire examination and a trial transcript that included off-the-record side bar discussions between the trial judge and trial counsel.  (Doc. 1, p. 101).

Regarding audiotapes of the voir dire examination, Hall's claim is moot insofar as this court conducted an in-depth review of the voir dire transcript when it considered Claim 1, <u>supra</u>, and ruled in Hall's favor based upon the written record.

Secondly, nothing in the two U.S. Supreme Court cases that Hall cited, Gardner v. Florida, 430 U.S. 349, 360-61 (1977), and Gregg v. Georgia, 428 U.S. 153, 167 (1976), requires the inclusion of audio recordings of voir dire proceedings (or any other proceedings, for that matter) in the appeal record.  Hall has not cited any other U.S. Supreme Court authority to support his assertion that the audio tapes were necessary.

Hall's argument must also fail with regard to including side-bar discussions in the transcript because Hall has identified no U.S. Supreme Court authority which requires that such "side bars" be part of the appeal record.  The one case that Hall did cite, Dobbs v. Zant, 506 U.S. 357 (1993) does not say anything about side bar discussions and holds simply that the Circuit Court of Appeals erred in refusing to even consider a trial transcript which was thought to be non-existent when the court reviewed the defendant's appeal, but a copy of which was located after the appeals court's initial ruling.  Id. at 358.

Thus, habeas corpus relief on this issue is not appropriate under either § 2254(d)(1) or § 2254(d)(2).

## CLAIM #20:  INEFFECTIVE ASSISTANCE OF COUNSEL

### (1)   REVIEWED AS MULTIPLE CLAIMS

Hall's ineffective assistance of counsel claim spans 44 pages and 18 separate subsections and sub-subsections.  See Doc. 1, pp. 102-146.  Hall argues in his reply brief that this court should consider cumulatively the claims contained in these sections.  (Doc. 33, p. 48).  Setting aside the fact that Hall's cumulativeness

argument is unsupported and raised for the first time in a reply brief, the court

notes that whether each subsection amounts to a separate claim, or whether Claim

#20 is one claim containing several examples of ineffective assistance of counsel to

be evaluated cumulatively, is a question that was addressed by the Eleventh Circuit

in Kelley v. Secretary for the Department of Corrections, 377 F.3d 1317, 1344 (11th

Cir. 2004).  In Kelley, the Eleventh Circuit described the petitioner's obligation to

raise the factual bases for his claims and the consequences for failing to do so:

> the prohibition against raising non-exhausted claims in federal
> court extends not only to broad legal theories of relief, but also
> to the specific assertions of fact that might support relief. For
> example, habeas petitioners may not present particular factual
> instances of ineffective assistance of counsel in their federal
> petitions that were not first presented to the state courts.
> Footman v. Singletary, 978 F.2d 1207, 1211 (11th Cir. 1992). As
> we explained,
>
>> allowing a habeas petitioner to allege a single
>> instance of ineffective assistance in his state post
>> conviction proceedings and then proceed to federal
>> court to allege additional instances would be
>> contrary to the state's "full and fair opportunity to
>> address the claim on the merits." The state would
>> never have the benefit of evaluating the claim
>> using a fully developed set of facts. This would not
>> be the "serious and meaningful" exhaustion of
>> claims that Congress intended.
>
> Id. .... Furthermore, habeas petitioners cannot preserve
> otherwise unexhausted, specific claims of ineffective assistance
> merely by arguing that their lawyers were ineffective in a
> general and unspecified way. See Weeks, 26 F.3d at 1044–46
> (rejecting petitioner's argument that "the general claim of
> ineffective assistance in state court preserves for federal review
> all alleged instances of ineffectiveness, regardless of whether
> evidence of a particular act was presented to the state court"). In

> sum, to preserve a claim of ineffective assistance of counsel for
> federal review, the habeas petitioner must assert this theory of
> relief and transparently present the state courts with the
> specific acts or omissions of his lawyers that resulted in
> prejudice.

Kelley, 377 F.3d at 1344.

Because the State has challenged some of Hall's ineffective assistance claims as being procedurally defaulted, and argued against others on the merits, the court will address each section and subsection as a separate claim, in accordance with the rule set forth in Kelley.  In doing so, the court will examine whether Hall asserted each theory of relief before the state courts.  If a given act or omission never came before the state courts for review, then this court will not consider it properly preserved for federal review and will not consider it when discussing the merits of Hall's ineffective assistance claim.

### (2)   STRICKLAND STANDARD FOR REVIEW OF INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Hall's ineffective assistance of counsel claims will also be evaluated through the familiar standard promulgated by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  To establish an ineffective assistance claim under the Sixth Amendment, "[a] petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  Wiggins v. Smith, 539 U.S. 510, 521 (2003).  "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  Halliburton v. Secretary for Dep't of Corrections, 342 F.3d 1233, 1243 (11th Cir. 2003).

101

To satisfy <u>Strickland</u>'s "deficient performance" prong, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." <u>Williams v. Allen</u>, 598 F.3d 778, 788 (11th Cir. 2010) (citation omitted).   "This requires showing that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment." <u>Halliburton</u>, 342 F.3d at 1243.   Given the "strong presumption in favor of competence," a petitioner bears the heavy burden of showing "that no competent counsel would have taken the action that his counsel did take."  <u>Williams</u>, 598 F.3d at 790 (citation and internal quotation marks omitted).   "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." <u>Harrington v. Richter</u>, --- U.S. ----, 131 S.Ct. 770, 788 (2011) (citation and internal quotation marks omitted).

As for <u>Strickland</u>'s "prejudice" prong, "the petitioner is required to prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Williams</u>, 598 F.3d at 789 (citation and internal quotation marks omitted).   "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  <u>Halliburton</u>, 342 F.3d at 1243.   "The likelihood of a different result must be substantial, not just conceivable."  <u>Harrington</u>, 131 S.Ct. at 792.

"Surmounting <u>Strickland</u>'s high bar is never an easy task."  <u>Padilla v.
Kentucky</u>, 559 U.S. 356, 371, (2010); <u>see</u> <u>also</u> <u>Harrington</u>, 131 S.Ct. at 788
(cautioning that "the <u>Strickland</u> standard must be applied with scrupulous care, lest
'intrusive post-trial inquiry' threaten the integrity of the very adversary process the
right to counsel is meant to serve").  However, it is even more daunting in the
habeas context where, as here, the state courts have adjudicated the ineffective
assistance claims on the merits in post-conviction proceedings, thereby triggering
the § 2254(d) limitations.  "When § 2254(d) applies, the question is not whether
counsel's actions were reasonable.  The question is whether there is any reasonable
argument that counsel satisfied <u>Strickland</u>'s deferential standard."  <u>Harrington</u>, 131
S.Ct. at 788.  "Thus, [Hall] not only has to satisfy the elements of the <u>Strickland</u>
standard, but he must also show that the State court applied <u>Strickland</u> to the facts
of his case in an objectively unreasonable manner."  <u>Williams</u>, 598 F.3d at 789
(citations and internal quotation marks omitted).  "The standards created by
<u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in
tandem, review is doubly so."  <u>Harrington</u>, 131 S.Ct. at 788 (citation and internal
quotation marks omitted); <u>see</u> <u>also</u> <u>Bell v. Cone</u>, 535 U.S. 685, 698-99 (2002) ("For
respondent to succeed, however, he must do more than show that he would have
satisfied <u>Strickland</u>'s test if his claim were being analyzed in the first instance,
because under § 2254(d)(1), it is not enough to convince a federal habeas court that,
in its independent judgment, the state-court decision applied <u>Strickland</u>
incorrectly.").

These burdens rest squarely on petitioner's shoulders.  After all, "[t]o give trial counsel proper deference, this circuit presumes that trial counsel provided effective assistance. … And it is the petitioner's burden to persuade us otherwise." Harvey v. Warden, Union Correctional Institution, 629 F.3d 1228, 1245 (11th Cir. 2011) (citations and internal quotation marks omitted).

**CLAIM 20 A:          GROSSLY INADEQUATE COMPENSATION.**

Hall argues that state funding and compensation for his defense attorneys was "grossly insufficient," and induced errors by defense counsel that prejudiced Hall in violation of Strickland, 466 U.S. at 686.  Hall presented this same argument in his Amended Rule 32 Petition before the Monroe County Circuit Court (State Court Appeal Record Vol. 54, p. 305) and his Rule 32 Petition before the Alabama Court of Criminal Appeals (State Court Appeal Record Vol. 58, p. 56).

The Alabama Court of Criminal Appeals ruled that Hall's assertion was procedurally barred pursuant to Rule 32.2(a) of the Alabama Rules of Criminal Procedure, to the extent that he was challenging the statutory limit on attorneys fees in capital cases.  Hall, 979 So.2d 125, 175-76 (Ala.Crim.App. 2007).  The Court of Criminal Appeals also ruled that, to the extent that Hall was raising an ineffective assistance of counsel claim, he failed to allege "a single act or omission on the part of his trial attorneys that he believes was the result of his counsel's compensation or that he believes constituted deficient performance.  Therefore, he has not satisfied his burden of pleading and proof pursuant to Rules 32.3 and 32.6(b), Ala.R.Crim.P."  Id. at 176.  Accordingly, the state argues that this issue is

procedurally defaulted because it was dismissed by the Alabama Court of Criminal Appeals under an independent and adequate state procedural rule.  (Doc. 13, p. 110).

This discussion, though it invokes state pleading rules, goes directly to the merits of Hall's claim; more precisely, it plainly states that the claim is nonmeritorious, as Hall failed to state his claim with the specificity required by Alabama's fact-pleading[10] post-conviction scheme, and failed to meet his burden of proof.  Therefore, based on Eleventh Circuit precedent and on this court's reading of the Alabama Court of Criminal Appeals holding in this case, the court finds that the inadequate compensation component of Hall's ineffective assistance of counsel claim was adjudicated "on the merits" and the Court of Criminal Appeals' disposition of the claim did not rest on an adequate and independent state law ground. See Frazier v. Bouchard, 661 F.3d 519, 526-27.  Thus, this court may address the claim, subject to review under the standards of the AEDPA, which limits this court's review to the allegations in Hall's Amended Rule 32 petition and whether they sufficiently state a claim for ineffective assistance of counsel.  Powell v. Allen, 602 F.3d 1263, 1273 (11th Cir. 2010).

Nevertheless, this court finds that Hall's argument, as stated in his Amended Rule 32 petition, fails on the merits.  See Trial Transcript Vol. 54, pp. 305-308.

---

[10] Federal habeas petitioners are also required to fact plead their claims. See McFarland v. Scott, 512 U.S. 849, 856 (1994) ("Habeas corpus petitions must meet heightened pleading requirements ..." (citing 28 U.S.C. § 2254 Rule 2(c))); see also Borden v. Allen, 646 F.3d 785, 808–13 (11th Cir. 2011) (comparing Alabama's post-conviction scheme to the federal rules governing habeas proceedings).

Federal courts have previously rejected ineffective assistance challenges to convictions grounded on the assertion that inadequate compensation to counsel causes ineffectiveness.  See Hallford v. Culliver, 379 F.Supp.2d 1232, 1279 (M.D. Ala. 2004); McNair v. Haley, 97 F.Supp.2d 1270, 1275 (M.D. Ala. 2000).  Rather, inadequate funding of counsel appointed to represent capital defendants must contribute to actual errors or shortcomings, as was stated by the Strickland court:

> A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case.

Id. at 690 (emphasis added).

Thus, Hall's allegation that compensation caps hindered the ability of defense counsel to represent him has meaning only by reference to specific errors or shortcomings purportedly caused by inadequate defense funding.  Only by examining specific errors or shortcomings can the court determine, first, whether it was an error outside the broad scope of competence expected of counsel, and second, whether the error caused real prejudice to the defendant.  Consequently, as a claim of ineffectiveness divorced from analysis of particular errors or omissions, the assertion that the State of Alabama provides inadequate compensation for capital defense counsel and experts fails to state a basis for habeas relief, and it is due to be denied.

106

**CLAIM 20 B:**        **FAILURE TO ADEQUATELY INVESTIGATE THE STATE'S CASE.**

Hall next argues that his attorneys failed adequately to investigate and prepare his defense, Doc. 1, p. 106, an argument which he also made in his Rule 32 Petition before the Alabama Court of Criminal Appeals (State Court Appeal Record, Vol. 58, p. 55-56).   The Court of Criminal Appeals found that he failed to satisfy the burdens of proof and specificity under Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure, as well as under the two Strickland prongs.   Accordingly, the state argues that this issue is procedurally defaulted because it was dismissed by the Court of Criminal Appeals under an independent and adequate state procedural rule.  (Doc. 13, p. 113).

However, as with Claim #20 A, above, the state appeals court's discussion goes directly to the merits of Hall's claim despite the fact that it invokes state pleading rules.  It plainly states that the claim is nonmeritorious because Hall both failed to meet the burden of proof and failed to state his claim with the specificity required by Alabama's fact-pleading post-conviction scheme.   Therefore, this court finds that Claim #20 B, alleging inadequate investigation by Hall's counsel, was adjudicated "on the merits" and the Court of Criminal Appeals' disposition of the claim did not rest on an adequate and independent state law ground.  See Frazier, 661 F.3d at 526-27.  Thus, this court may address the claim, subject to review under the standards of the AEDPA, which limits this court's review to the allegations stated in Hall's Amended Rule 32 Petition.  Powell, 602 F.3d at 1273.

After reviewing Hall's claim on the merits, however, this court finds Hall's argument is entirely conclusory, offering no evidence from the extensive trial record[11], and thus failing to satisfy either of <u>Strickland</u>'s two prongs.  <u>See</u> Trial Transcript Vol. 54, pp. 308-309.  With regard to the "deficient performance" prong, Hall points to nothing which suggests that his trial counsels' representation fell below an objective standard of reasonableness, nor that either counsel made errors so serious that they ceased to function as counsel guaranteed by the Sixth Amendment.  <u>See</u> <u>Williams</u>, 598 F.3d 788; <u>Halliburton</u>, 342 F.3d at 1243.  With regard to <u>Strickland</u>'s "prejudice" prong, Hall similarly failed to point to anything in the record that indicated a reasonable probability that, but for counsels' unprofessional errors, the result of the proceeding would have been different.  <u>Williams</u>, 598 F.3d at 789.

Additionally, although Hall cited several U.S. Supreme Court cases for support, including <u>Strickland</u>, <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003), and <u>Rompilla v. Beard</u>, 545 U.S. 374, 387 (2005), he made no argument about how those cases are similar to his own case, or how the precedent applies here.  (Doc. 1 at 105-06).  At the habeas corpus stage of review, where the petitioner has the burden of rebutting by clear and convincing evidence the presumption of correctness enjoyed by the state court judgment, it does not suffice for Hall simply to cite a number of

---

[11] The court notes that Claim #20 B does not contain even one reference or citation to the 48 volume record in this case.

U.S. Supreme Court cases and then juxtapose them with his argument, without also connecting the two.  See § 2254(e)(1).

**CLAIM 20 C:**          **INEFFECTIVE  ASSISTANCE AT GUILT PHASE**

**CLAIM 20 C(1):**    **FAILURE TO ENSURE THAT HALL WAS PRESENT THROUGHOUT ALL PHASES OF TRIAL**

The infirmities in this contention have already been explored in some detail in the section discussing Claim #10, supra.  No constructive purpose would be served by reiterating them in full here.  It shall suffice to state that, as with Claim #10, the record does not support Hall's contention that the trial court concluded the oral argument for his motion to dismiss the indictment in-chambers.  See Trial Transcript Vol. 44, pp. 7796-7800.  Rather, the record clearly reflects that defense counsel argued his motions before the trial judge in open court before the judge adjourned to his chambers with defense counsel and the prosecutor to listen to the medical examiner's taped testimony.  See Trial Transcript Vol. 45, p. 7801.  Upon returning from this short recess, the trial judge made a point of stating that it "made no rulings or took no action while in chambers," id. at 7801-02, and gave defense counsel an opportunity to make any further argument he wished.  Id.

This court also found that Hall's citation of Stincer, 482 U.S. 730, did not support his position.  See Claim #10, supra.  The Stincer court reasoned that the defendant's rights were not violated by his exclusion from a competency hearing where the defendant presented no evidence that his presence would have resulted "in a more assured determination of competency."  Stincer, 482 U.S. at 747.

Similarly, Hall presented no evidence that his presence would have resulted "in a more assured determination" of his motions.

In support of his ineffective assistance of counsel claim, Hall also cites <u>Snyder v. Massachusetts</u>, 291 U.S. 97, 105-06 (1934), <u>overruled on other grounds by</u> <u>Malloy v. Hogan</u>, 378 U.S. 1, 17 (1964), for the proposition that a defendant has the right to attend any trial proceeding in which his presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge," and argues that he had the right to be present in the trial judge's chambers to review the testimony of the medical examiner, in order to "assist in his own defense." (Doc. 1, p. 108). However, Hall offers no evidence whatsoever that he could have assisted in his own defense or that his presence in the trial judge's chambers had any relation, substantial or otherwise, to "the fullness of his opportunity to defend against" the charge of capital murder, especially where the record reflects that the judge simply listened to a tape of the medical examiner's testimony before returning to the courtroom.   <u>See</u> Trial Transcript Vol. 45, p. 7801-02.

Hall also cites <u>United States v. Gagnon</u>, 470 U.S. 522 (1985).  (Doc. 1 at 107). <u>Gagnon</u> is as unhelpful to him as <u>Synder</u>, however, because the absence of the defendant in that case at an in-chambers discussion hinged on Rule 43 the Federal Rules of Criminal Procedure, which are not at issue here.  <u>Id.</u> at 525.  Also at issue in <u>Gagnon</u> was the judge's discussion with a single juror outside the presence of the defendant, which constitutes a clear factual distinction from Hall's case.  <u>Id.</u> Moreover, the <u>Gagnon</u> court ultimately held that "respondents' rights under the

Fifth Amendment Due Process Clause were not violated by the *in camera* discussion with the juror," and cautioned that "the exclusion of a defendant from a trial proceeding should be considered in light of the whole record." Id. at 526-27 (citing Snyder, 291 U.S. at 115).

What is more noteworthy for purposes of examining Hall's ineffective assistance of counsel claim, however, is the fact that Hall merely concluded that his attorneys rendered ineffective assistance, without citing any case law whatsoever. With no authority supporting this claim, Hall has not shown that his lawyers' performance was per se deficient.[12]  And, with no evidence from the record, Hall cannot possibly satisfy either prong of the Strickland standard.

### CLAIM 20 C(2):   FAILURE TO REQUEST A FELONY-MURDER INSTRUCTION

As discussed in some detail in Claim #8, above, the record does not reflect that Hall requested a felony murder instruction.  He now asserts that this constituted ineffective assistance from his trial counsel.  (Doc. 1, p. 109).  Yet, as the Alabama Court of Criminal Appeals noted on direct appeal, "[t]he evidence showed that Haskew was shot twice in the head, beaten repeatedly, and strangled.  There was absolutely no evidence presented that would bring the murder into the definition of felony murder." Hall, 820 So.2d at 139.  Hall did not identify any such evidence in his habeas petition.  Without such evidence, Hall cannot show that

---

[12] Hall's argument on this point in his reply brief is similarly conclusory and unconvincing.  See Doc. 33, p. 52-53.

defense counsel's representation fell below an objective standard of reasonableness, as <u>Strickland</u> requires. <u>See</u> 466 U.S. at 687. Accordingly, this court finds that Hall has failed to establish the deficient performance prong of <u>Strickland</u>.

> ### CLAIM 20 C(3):   FAILURE TO ARGUE SECOND MOTION FOR CHANGE OF VENUE AT THE END OF VOIR DIRE

Hall next cites the U.S. Supreme Court's opinions in <u>Rideau v. State of Louisiana</u>, 373 U.S. 723, 725 (1963) and <u>Irvin v. Dowd</u>, 366 U.S. 717, 727 (1961) to support his argument that his defense counsel were ineffective for failing to renew a second motion to change venue at the end of the voir dire examination.  (Doc. 1, p. 111).  Unfortunately, the citations of <u>Rideau</u> and <u>Irvin</u> are dropped into Hall's habeas petition with no attempt to connect their precedential value to the <u>Strickland</u> analysis that is part and parcel of an ineffective assistance of counsel claim.  Hall makes no argument (to say nothing of affirmatively proving) that the failure to argue the second motion for change of venue constituted either deficient performance by defense counsel or that it prejudiced his defense.  <u>See</u> Doc. 1, p. 111-12.   Nor is this alleged failure the type of allegation which gives rise to a presumption of prejudice.  <u>See</u> <u>Strickland</u>, 466 U.S. at 692.  Accordingly, habeas relief pursuant to <u>Strickland</u> is denied with regard to this claim.

> ### CLAIM 20 C(4):   FAILURE TO REMOVE JURORS FOR CAUSE WHO SHOULD HAVE BEEN EXCLUDED UNDER <u>MORGAN v. ILLINOIS</u>

Hall asserts that his trial counsel rendered ineffective assistance by not requesting that venireperson Elizabeth McKinley be struck for cause due to her

allegedly strong feelings in support of the death penalty.  (Doc. 1, pp. 113-14).  Hall

maintains that McKinley indicated during voir dire that she had a fixed opinion in

favor of capital punishment so that she would always vote to impose the death

penalty, as evidenced by the fact that she and other jurors on her panel raised their

hands when queried by the trial court on this point.  See Trial Transcript Vol. 33, p.

5512).  Hall also claims that McKinley "further stated that her view of the death

penalty would not be changed."  (Doc. 1, p. 113).[13]

This court has already discussed the shortcomings in Hall's argument in

Claim #6, supra, and will not repeat its reasoning here.  It shall suffice to say that

this court determined that the issue had no merit, in no small part because Hall's

characterization of McKinley's voir dire testimony was not entirely accurate.  Hall

omitted more circumspect answers given by McKinley which tended to detract from

a picture of her as one who would always vote to impose the death penalty.  For

example, when defense counsel asked McKinley whether she would "take [her

strong views on the death penalty] into the jury box," she answered that,

> I wouldn't say that I'd have the feeling with me. I'd have to hear
> everything before – you know, you've got to hear all the sides of
> anything because I don't know the story.  I mean, I'd have to
> hear it.

(Trial Transcript Vol. 33, p. 5557).  Reinforcing this view were additional portions of

McKinely's voir dire testimony that Hall did not cite in his petition.  When asked by

the prosecutor whether she would "automatically, in every case, vote for the death

---

[13] The court notes that Hall's citation to the record on this point (Trial Transcript Vol. 33, p. 5556) does not reflect this alleged statement by venireperson McKinley.

penalty," McKinley stated, "No, not unless I could hear, you know, both sides of everything …" (Trial Transcript Vol. 33, p. 5539).  When the prosecutor asked her whether she could consider both the aggravating factors and mitigating factors and weigh them before making a decision, McKinley stated, "I think so."  Id.

Rather than someone who would always vote for the death penalty, automatically and regardless of evidence of mitigating circumstances, McKinley's answers revealed a potential juror who supported the death penalty but who indicated that she wanted to hear "everything" before voting on the appropriate penalty.  Id.

Because the record does not support Hall's view of McKinley as a venireperson who would automatically vote in favor of the death penalty regardless of the evidence, Hall has not shown that his trial counsel's representation fell below an objective level of reasonableness, as required by Strickland.  466 U.S. at 688. "Counsel cannot be labeled ineffective for failing to raise issues which have no merit."  Cave v. Secretary for Dep't of Corrections, 638 F.3d 739, 755 (11th Cir. 2011) (citation and internal quotation marks omitted).  Instead, Hall simply concludes that defense counsels' "performance was ineffective and, since it cost trial counsel a peremptory strike, it could never be considered part of trial strategy." (Doc. 1, p. 114).  This establishes neither deficient performance nor actual prejudice and therefore, Hall's claim on this issue is denied.

**CLAIM 20 C(5):   FAILURE TO LITIGATE A BATSON CHALLENGE PROPERLY**

In light of the court's findings with regard to Claim #1, <u>supra</u>, Hall's

ineffective assistance of counsel claim for failure to litigate a <u>Batson</u> claim properly

is moot.

### CLAIM 20 D:          PENALTY AND SENTENCING PHASE

### CLAIM 20 D(1):     FAILURE TO REQUEST THAT THE TRIAL JUDGE INSTRUCT JURORS THAT THEY MUST VOTE FOR LIFE WITHOUT PAROLE IF THE AGGRAVATING AND MITIGATING CIRCUMSTANCES WERE EQUALLY BALANCED

Hall argues next that his attorneys did not request a jury instruction

specifying that if aggravating circumstances were equally balanced with mitigating

circumstances, then the jury must vote for life in prison without the possibility of

parole.  (Doc. 1, pp. 124-25).  By not requesting such an instruction, Hall maintains

that defense counsel "abdicated their responsibility to ensure that Mr. Hall received

a fair trial."

Hall included a general citation to <u>Strickland</u>, specifying no page number,

which presumably was intended to signify that his attorneys' performance was

deficient enough to meet <u>Strickland</u>'s deficient performance and that such

performance satisfied the actual prejudice prongs.  <u>See</u> <u>Strickland</u>, 466 U.S. at 689,

692.  However, it does not suffice on federal habeas review for Hall to simply insert

a citation to <u>Strickland</u> at the end of a conclusory statement in his petition and then

expect the court to find in his favor.  The burden is upon Hall to explain how or why

defense counsels' alleged shortcomings satisfied the <u>Strickland</u> prongs, either

because counsel's representation fell below an objective standard of reasonableness,

115

or because the result of the proceeding would have been different but for counsel's shortcomings.  Williams, 598 F.3d at 789.

Nor is Hall's claim advanced by his citation of Blystone v. Pennsylvania, 494 U.S. 299 (1990).  Hall's argument is that the trial court in his case should have instructed the jury to recommend a sentence of life imprisonment if they found the aggravating circumstances to be equally balanced by the mitigating circumstances. (Doc. 1, p. 124).  The Blystone court, however, upheld Pennsylvania's death penalty statute after finding that it was imposed "only after a determination that the aggravating circumstances outweigh the mitigating ones present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances."  Blystone, 494 U.S. at 305.  There is no mention of an equal balance between aggravating and mitigating circumstances.  Moreover, the trial court in Hall's case gave precisely the instruction that Blystone would require, telling the jury that

> [if] you are convinced that the aggravating circumstance outweighs the mitigating circumstance, then your verdict would be, "We, the jury, having found by unanimous vote of all twelve jurors that at least one aggravating circumstance has been proved by the State and after weighing the aggravating and mitigating circumstances, do recommend that the Defendant, Steven Wayne Hall, be punished by death."

(Trial Transcript Vol. 47, p. 8314).

Thus, the court finds that Hall has shown neither deficient performance nor actual prejudice with regard to this legal defense.  Accordingly, his claim of ineffective assistance of counsel on this issue is denied.

116

**CLAIM 20 D(2):     FAILURE TO MOVE FOR RECESS DURING
THE  SENTENCING PHASE AND
DELIBERATIONS.**

Hall also claims that his attorneys rendered ineffective assistance by not moving for a recess during the sentencing phase and before jury deliberations, and for not asking the trial court to move deliberations to the following Monday.  (Doc. 1, p. 128-29).   The Court of Criminal Appeals upheld the Circuit Court's finding on collateral appeal that Hall had failed to satisfy the burdens of proof and specificity under Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure, as well as the two <u>Strickland</u> prongs.  Accordingly, the state argues that this issue is procedurally defaulted because it was dismissed by the Court of Criminal Appeals under an independent and adequate state procedural rule.  (Doc. 13, p. 156).

However, as with claims  #20 A and #20 B, above, the state appeals court's discussion goes directly to the merits of Hall's claim despite the fact that it invokes state pleading rules.  It plainly states that the claim is nonmeritorious because Hall both failed to meet the burden of proof and failed to state his claim with the specificity required by Alabama's fact-pleading post-conviction scheme.  <u>Hall</u>, 979 So.2d at 151.  Therefore, this court finds that this claim #20 D(2) was adjudicated "on the merits" and the Court of Criminal Appeals' disposition of the claim did not rest on an adequate and independent state law ground.  <u>See</u> <u>Frazier</u>, 661 F.3d at 526-27.  Thus, this court may address the claim, subject to review under the standards of AEDPA, which limits this court's review to the allegations stated in Hall's Amended Rule 32 Petition.  <u>Powell</u>, 602 F.3d at 1273.

117

Turning to the merits of Hall's claim on this point, the court notes that Hall has peppered this subsection with conclusory statements that are unsupported by any citation to the record or to case law, such as Hall's assertions that "[t]hose [jurors] who were for death got angry at those who were holding out for life," id. at 129; "[a]t least one juror was very concerned about concluding deliberations in time for church that morning.  Under pressure and due to extreme fatigue, two of the four hold-out jurors decided to switch to vote for death," id.; "[w]ithout extreme fatigue and the pressure to conclude deliberations in time for church, it is likely that the jury would not have had enough votes for a death sentence."  Id. [14]

Weighing these conclusory statements against the "highly deferential" judicial scrutiny of counsels' performance that Strickland requires, 466 U.S. at 689, this court finds that Hall has not established that his trial counsels' failure to request a recess during penalty phase deliberations amounted to deficient performance.  Additionally, given the amount and degree of speculation in Hall's brief, the court also finds that he has failed to affirmatively prove prejudice, as required by Strickland.  Accordingly, habeas relief is denied with respect to this issue.

---

[14] Hall quotes the Alabama Court of Criminal Appeals Rule 32 order as saying "[t]he deliberations continued long into the night because *four* of the jurors were holding out for life. They were also receiving heavy pressure from the others to change their minds, so that they could all get rest.  Those who were for death got angry at those who were holding out for life." Hall 2007 WL 866652 at *22.  This court points out that the quoted language was itself quoted from Hall's appeal brief by the state court.  In other words, Hall has simply quoted his own allegations, but done so in such a way as to give the impression that the Alabama Court of Criminal Appeals was making the statement.

**CLAIM 20 D(3):   FAILURE TO PUT ON SEVERAL MITIGATION WITNESSES, INCLUDING HALL'S FAMILY**

Hall's next claim alleges that defense counsel failed to call "relatives and friends" as penalty phase witnesses who would have "testified about Mr. Hall's acts of kindness and loyalty to family and friends, as well as troubling signs of mental and emotional disabilities, exhibited at an early age." (Doc. 1, p. 130). The "relatives and friends" that Hall identified are his parents, grandmother, and aunt and uncle, id. at pp. 132-34, each of whom testified before the trial judge at Hall's sentencing hearing, but not before the jury at the penalty phase of trial.

Hall states that this alleged failure meets the deficient performance and prejudice prongs of Strickland, amounting to ineffective assistance of counsel which "deprived Mr. Hall of his constitutionally guaranteed right to put relevant evidence before the sentencing body during a capital proceeding." Id. at 135. Although Hall cites multiple U.S. Supreme Court cases for support, these cited cases either fail to support his case as claimed, or are not analogous enough to the facts of Hall's case to merit granting habeas relief, as explained below.

First, Hall's invocation of Lockett v. Ohio, 438 U.S. at 604-05, is misplaced because ineffective assistance of counsel and the quality of the mitigation investigation were not issues in that case, as Hall alleges they are in his case. Rather, Lockett concerned a state statute which unconstitutionally precluded the sentencing judge from considering certain mitigating factors such as the defendant's character, prior record, age, lack of specific intent to cause death, and her relatively

119

minor role in the crime.  <u>Lockett</u> at 597.   Similarly, ineffective assistance of counsel was not an issue in <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976), or in <u>Gregg v. Georgia</u>, 428 U.S. 153, 206 (1976).  Instead, in <u>Woodson</u>, the court addressed the unconstitutionality of North Carolina's mandatory death sentence for first-degree murder, making that case materially distinguishable from Hall's case, as well.  <u>Id.</u> at 292-93.  And in <u>Gregg</u>, the court addressed Georgia's capital sentencing scheme, which it found to "[serve] as a check against the random or arbitrary imposition of the death penalty."  <u>Id.</u> at 206.

Hall also cites <u>Wiggins v. Smith</u>, 539 U.S. 510, 524 (2003), and <u>Williams v. Taylor</u>, 529 U.S. 362 (2000), but to no avail.  In <u>Wiggins</u>, the U.S. Supreme Court found that petitioner's counsel had failed to conduct a reasonable mitigation investigation when he relied solely on municipal social services records and a pre-sentence investigation report, and further found that defense counsel's failure to investigate "thoroughly stemmed from inattention, not strategic judgment." <u>Wiggins</u>, 539 U.S. at 512.  In <u>Williams</u>, the Court ruled that petitioner's counsel fell below the range of competence demanded of lawyers in criminal cases because he failed to introduce evidence of the petitioner's background, including a history of childhood abuse; did not call as witnesses correctional officers who were willing to testify that Williams would not pose a danger while incarcerated; did not call several character witnesses; and did not introduce evidence that Williams was borderline mentally retarded.  <u>Williams</u>, 529 at 372-73.

The poor performance sanctioned by the U.S. Supreme Court in <u>Wiggins</u> and <u>Woodson</u> was not displayed by Hall's attorneys, who, by contrast, hired a mitigation investigator to conduct a far more sweeping investigation than that in <u>Wiggins</u>, and who testified during the penalty phase at great length and in great detail, unlike in <u>Williams</u>. <u>See</u> Trial Transcript Vol. 2, p. 231-33; Trial Transcript Vol. 46, pp. 8017-8105. Specifically, the mitigation investigator testified that she interviewed Hall's mother, sister, grandmother, aunt, uncle, cousins, a former school teacher, and Hall's former stepfather. (Trial Transcript Vol. 46, p. 8019-26). She testified extensively about the results of her investigation into Hall's childhood, including detailed testimony regarding his mother's multiple marriages, her frequent moves and lack of a stable home environment, an incident in which an abusive stepfather killed Hall's childhood dog, and various behavioral problems Hall exhibited in his teenage years, which culminated in a suicide attempt and incarceration at a juvenile detention center. <u>Id.</u> at 8025-56.

Also testifying at the penalty phase of Hall's trial were Hall's former schoolteacher, Mario Garcia; his former stepfather, Fritz Wiese; and a social worker, Barry Snyder, who specialized in working with children and adolescents. <u>Id.</u> at 8107-37. Additionally, Hall's attorneys hired a clinical psychologist and neuropsychologist named Dr. John Goff, who testified at length about his mental health examination of Hall. <u>Id.</u> at 8162-8236.

In short, the investigation performed by Hall's defense team and the mitigation evidence presented to the jury during the penalty phase of trial was not

even remotely as limited as that in <u>Wiggins</u> or <u>Williams</u>.  The two cases are not "materially indistinguishable" from Hall's case, and therefore, habeas relief is not warranted pursuant to § 2254(d)(1).  Moreover, this court is also mindful that it must indulge in a "strong presumption" that defense counsels' conduct "falls within the wide range of reasonable professional assistance."  <u>Strickland</u>, 466 U.S. at 689.  The <u>Strickland</u> court held in no uncertain terms that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."  <u>Strickland</u>, 466 U.S. at 690.  Upon this record, with its extensive mitigation investigation and the fact that Hall's defense team located five witnesses who were willing and able to testify on his behalf at the trial's penalty phase, this court cannot say that defense counsel's challenged conduct was deficient or prejudicial to Hall.

### <u>CLAIM 20 D(4)</u>:   FAILURE TO INTRODUCE MITIGATION EVIDENCE.

Hall next claims that his attorneys failed to "put on" mitigation evidence by not fully investigating his background and preparing for the penalty phase of his trial.  (Doc. 1, p. 137).  The state argues that this claim is procedurally defaulted because the Rule 32 circuit court held that Hall failed to comply with specificity and full factual pleading requirements of Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.  (Doc. 13, p. 180).

This court has already discussed the Eleventh Circuit's ruling in <u>Borden</u>, 646 F.3d 816, <u>supra</u>, which holds that claims dismissed by a state court pursuant to Rule 32.6(b) of the Alabama Rules of Criminal Procedure have in fact been

considered on the merits.  See Claim # 20 A, Claim # 20 B(2), and Claim #20 D(2),

supra.  For the same reasons as discussed above, this court finds that it is not

precluded from considering Hall's claim on the merits, subject to the standards of

AEDPA.  See Powell, 602 F.3d at 1273.

Unfortunately for Hall, a review on the merits reveals that this claim is not

due to be granted under Strickland or pursuant to § 2254(d)(1) or § 2254(d)(2).

Although Hall again cites Rompilla, 545 U.S. at 374, Wiggins, 539 U.S. at 510, and

Williams, 529 U.S. at 362, none of these cases can reasonably be considered as

materially indistinguishable from his case.  Once more, Hall simply cites U.S.

Supreme Court precedent dealing with the subject matter of the relevant claim but

fails to identify or explain the similarities between the cited case and his own.  The

record evidence in Hall's case contains multiple examples of the extensive

background investigation conducted by the defense team's mitigation investigator,

whose efforts are discussed in Claim 20 D(3), above.  Rompilla, Wiggins, and

Williams, on the other hand, each featured mitigation investigations that were far,

far less extensive and saw mitigation evidence that was not offered.  In Rompilla,

the petitioner's trial counsel failed to present "significant mitigating evidence about

Rompilla's childhood, mental capacity and health, and alcoholism."  Rompilla, 545

U.S. at 378.  In Williams, defense counsel failed to introduce evidence of the

petitioner's history of childhood abuse; did not call as witnesses correctional officers

who were willing to testify that the petitioner would not pose a danger while

incarcerated; did not call several character witnesses; and did not introduce

evidence that the petitioner was borderline mentally retarded.  <u>Williams</u>, 529 at

372-73.  And in <u>Wiggins</u>, defense counsel relied solely on municipal social services

records and a pre-sentence investigation report, and conducted no further

mitigation investigation.  <u>Wiggins</u>, 539 U.S. at 512.  These cases cannot be

analogized to Hall's case, where the defense team presented detailed testimony

regarding his troubled childhood, including testimony by the defense mitigation

investigator, a former schoolteacher of Hall's, a former social worker, a

neuropsychologist, and one of Hall's former stepfathers.  Their testimony detailed

Hall's lack of a stable home environment during childhood and his "chaotic" pre-

teen years (Trial Transcript Vol. 46, p. 8049), his mother's multiple marriages and

divorces (<u>id.</u>), the physical and emotional abuse which Hall suffered at the hands of

an abusive stepfather (<u>id.</u> at 8044), Hall's tendency to internalize anger and erupt

into fits of rage  (<u>id.</u> at 8124-29), an incident in which Hall burned down his

mother's house when he was fourteen years old  (<u>id.</u> at 8054), Hall's improving

behavior at school and at home upon being shown affection by adults (<u>id.</u> at 8110-

11), and various behavioral problems Hall exhibited in his teenage years, which

culminated in a suicide attempt and incarceration at a juvenile detention center (<u>id.</u>

at 8025-56).

     To the extent that Hall would now criticize his defense counsel for relying on

an investigator rather than personally conducting the mitigation investigation, this

court agrees with the Alabama Court of Criminal Appeals, which accurately pointed

out that the U.S. Supreme Court did not expressly or impliedly hold that counsel

must perform the investigation personally in any of its decisions in <u>Rompilla</u>, <u>Wiggins</u>, or <u>Williams</u>. [15]

Moreover, as stated with regard to Claim #20 D(3), above, this court is also mindful that it must indulge in a "strong presumption" that defense counsels' conduct "falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689.  In attempting to rebut this presumption, Hall alleges, with no citation to the record, that his trial counsel "failed to investigate, obtain and present evidence from any records, and [failed to] properly put on evidence that the Judge and jury could have considered mitigating."  (Doc. 1, p. 138).  The trial record paints an entirely different picture of the defense team's investigation and presentation to the jury of mitigating evidence, summarized, <u>supra</u>.  Thus, this court finds that Hall has not shown that his counsels' representation fell below an objective standard of reasonableness, thereby failing to satisfy the first prong of <u>Strickland</u>.  For this reason, Hall's claim on this issue is denied.

### CLAIM 20 D(5):   FAILURE TO OBJECT TO IMPROPER ARGUMENTS MADE BY THE PROSECUTOR DURING CLOSING ARGUMENTS.

#### (a)   Prosecutor's Alleged Misstatement of the Definition of Reasonable Doubt.

Hall next argues that his trial counsel rendered ineffective assistance by failing to object to the prosecutor's alleged misstatement of the definition of

---

[15] The court has previously discussed that <u>Lockett</u>, <u>Woodson</u>, and <u>Gregg</u> (which are cited in Hall's reply brief) did not deal with the issue of ineffective assistance of counsel, and therefore are materially distinguishable from Hall's case with regard to this claim.

reasonable doubt under Alabama law.[16]  (Doc. 1, p. 141).  Hall's claim on this point must fail because he cannot satisfy either prong of Strickland.

With regard to the deficient performance prong, the Alabama Court of Appeals noted on direct appeal that the prosecutor's definition was not an incorrect statement of law.  Hall, 820 So.2d at 141-42.  Indeed, "Alabama courts have been sympathetic to attempts to define a reasonable doubt as a doubt for which a reason can be given." Alabama Evidence 3d, § 3:34 (updated June 2011) (citing Hall v. State, 54 Ala. App. 198, 202 (Ala.Crim.App. 1974), Baker v. State, 477 So.2d 496, 502-03 (Ala.Crim.App. 1985)(overruled on other grounds by Ex parte Frazier, 562 So.2d 560 (Ala. 1989)).  Therefore, failure to make what would have amounted to a baseless objection cannot be ineffective assistance of counsel, as a matter of law. See, e.g., Cave v. Secretary for Dep't of Corrections, 638 F.3d 739, 755 (11th Cir. 2011) ("[c]ounsel cannot be labeled ineffective for failing to raise issues which have no merit") (citation omitted).

As to the prejudice prong of Strickland, and as noted in Claim # 13(B), above, the trial court appropriately instructed the jury on the concept of reasonable doubt. Hall, 820 So.2d at 142.  The definition of reasonable doubt that the trial court gave to the jury was as follows:

> The phrase reasonable doubt is self-explanatory. Efforts
> to define it do not always clarify the term. But, it may
> help to know that it is not a mere possible doubt.
> Everything relating to human affairs is open to some

---

[16] The prosecutor defined reasonable doubt as "…a doubt for which you can give a particular reason."  (Trial Transcript Vol. 45, pp. 7835-36).

> possible or imaginary doubt.  A reasonable doubt is a
> doubt of a fair-minded juror, honestly seeking the truth
> after careful and impartial consideration of all the
> evidence in the case.  It's a doubt based upon reason and
> common sense.  It does not mean a vague or arbitrary
> notion, but, is an actual doubt based upon the evidence, a
> part of the evidence, a lack of evidence, a conflict in the
> evidence or a combination of those factors.  It is a doubt
> that remains after going over, in your minds, the entire
> case and giving consideration to all the testimony.  It's
> distinguished from mere possibility, from bare
> imagination or from fanciful conjecture.

(Trial Transcript Vol. 45, pp. 7888-7890).  The trial court also instructed the jury

that "no statements or arguments of the attorneys constitute proof.  The proof is in

the testimony of witnesses and exhibits which have been admitted in the case."  Id.

at 7896.

Accordingly, habeas relief on this issue is inappropriate.

### (b)    Prosecutor's Alleged Prejudicial Name-Calling.

Hall next alleges that that defense counsel were ineffective for failing to

object to the prosecutor's allegedly prejudicial statements at closing arguments –

namely, the prosecutor's assertion that the jury could consider profanities that Hall

had yelled at authorities shortly before his arrest.  (Doc. 1, p. 142).  The state

contends that this issue is procedurally defaulted because Hall did not raise it when

he appealed the circuit court's denial of his amended Rule 32 petition, and

therefore, the claim was not fully exhausted.  (Doc. 13, p. 186).  A review of Hall's

collateral appeal brief confirms that Hall did not raise this claim before the

Alabama Court of Criminal Appeals.  See Trial Transcript Vol. 58, Tab R-68.

Therefore, the state courts have not had a full and fair opportunity to decide this claim and Hall is procedurally barred by exhaustion principles from pursuing them here.  See, e.g., Mancill v. Hall, 545 F.3d 935, 939 (11th Cir. 2008) (explaining that the habeas exhaustion requirement "is not satisfied if the petitioner fails to present his claims to the state's highest court," and that "[s]uch a failure to exhaust can result in a procedural default that bars a federal court from hearing that claim").

> **(c)** **Allegation That The Prosecutor Improperly Told the Jury That The Only Sentence For This Case Was Death**

Hall next alleges that his attorneys were ineffective for failing to object to the prosecutor's statement that "Steve Hall is bad. And the law has a way of dealing with people like that."  (Trial Transcript Vol. 47, p. 8270).  This statement, according to Hall, was inconsistent with Alabama law in that it made the jurors feel as if a vote for a life sentence without parole would be a violation of the law.  (Doc. 1, p. 143).

Hall cites Penry v. Lynaugh, 492 U.S. 302 (1989), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304 (2002), and Eddings, 455 U.S. 104, for the proposition that "[t]he Eighth Amendment to the United States Constitution requires that a capital sentencing jury not be precluded from considering any mitigating evidence weighing against a death sentence."  (Doc. 1, p. 143).  However, Perry and Eddings addressed, respectively, jury instructions from the court and a state statute on mitigating evidence, and not statements made by a prosecutor.  See Perry, 492 U.S. at 311; Eddings, 455 U.S. at 114-15.  Furthermore, any concerns

that the jury may have felt unable to assign weight to the mitigating circumstances is belied by the fact that the trial court instructed the jury as follows:

> "if after a full and fair consideration of all the evidence in this case you determine that the mitigating circumstances outweigh any aggravating circumstance that does exist, or you're not convinced, beyond a reasonable doubt, that at least one aggravating circumstance does exist, your verdict would be to recommend punishment of life without parole ..."

(Trial Transcript Vol. 47, p. 8315).  Therefore, Hall has not shown that he was prejudiced by the prosecutor's remark, and cannot satisfy the requirements of Strickland, 466 U.S. at 691.

Accordingly, this court finds that habeas relief is inappropriate with regard to this claim.

### (d)    Allegation That The Prosecutor Improperly Implied Satanism in Order to Inflame and Prejudice the Jury

Hall's next allegation of ineffective assistance of counsel is that his attorneys failed to object to what he describes as the prosecutor's attempts to "enrage the jury" by making allusions to Satanism during closing argument.  (Doc. 1, p. 144).

The statement in question was the following: "The evidence is that Mr. Hall stands here before you a convicted, cold-blooded murderer.  A murderer of a crime that has the most evil, most despicable facts and evidence you can think about.  A night of horror.  A night of absolute hell for Clarene Haskew."  (Trial Transcript Vol. 47, p. 8267).  It is Hall's burden to affirmatively prove that these words prejudiced him, Strickland at 693; yet he has cited no authority whatsoever which would

129

establish that such a statement is prejudicial or in any way improper, or that objecting to such a statement would have led to a substantial likelihood of a different result.  Without such authority, Hall's argument is conclusory and cannot form the basis for habeas relief.

<u>CLAIM #20 D(6)</u>:  FAILURE TO OBJECT TO THE PENALTY-PHASE JURY INSTRUCTION REGARDING UNANIMITY ON MITIGATION

Hall asserts that his trial counsel were ineffective because they did not object to the trial court's penalty-phase jury instructions regarding mitigating circumstances.  (Doc. 1, p. 145).  The trial court's instructions to the jury did not include an instruction that unanimity with regard to finding a mitigating circumstance was unnecessary.  <u>See</u> Trial Transcript Vol. 47, pp. 8289-95.  The court addressed this underlying issue in Claim #14, <u>supra</u>, finding that it does not warrant habeas relief because neither the instructions nor the verdict forms said anything about how—or even whether—the jury should make individual determinations whether a particular mitigating circumstance existed -- rather, the jury instructions focused only on the overall balancing question.  <u>Id.</u>  This court also ruled that Hall's argument was unconvincing because the trial court instructed the jury repeatedly that they must unanimously determine the existence of each aggravating factor.  <u>Id.</u> at 8295, 8300, 8314.  The fact that the trial judge specified a unanimity requirement with regard to aggravating circumstances, but not with regard to mitigating circumstances, suggests that the jurors did not mistakenly think that they were required to unanimously find a mitigating circumstance.

Accordingly, with the underlying claim having been rejected, this court finds that Hall has failed to establish deficient performance on the part of his defense counsel, for failure to make what would have amounted to a baseless objection cannot be ineffective assistance of counsel, as a matter of law.  See, Cave, 638 F.3d at 755.  Therefore, habeas relief due to ineffective assistance of counsel is not appropriate with regard to this issue.

### CLAIM #20 D(7):  FAILURE TO OBJECT TO THE TRIAL COURT'S FINDING OF HALL'S AGE AT THE TIME OF THE VICTIM'S DEATH

Finally, Hall claims that his attorneys were ineffective for failing to object to the trial court's finding regarding his age.  (Doc. 1, p. 146).  Despite the fact that Hall was twenty-one years old when he murdered Mrs. Haskew, at sentencing, the trial court stated Hall's age as "twenty-two years of age at the time he committed the crime."  (Trial Transcript Vol. 48, p. 8528).  Hall now contends that his attorneys should have objected to this miscalculation because "Hall was entitled to the trial court's full recognition and consideration of any and all factors mitigating in favor of life imprisonment without parole, including his age."  (Doc. 1, p. 146.)  Hall then states that his counsels' failure to object was "ineffective and prejudicial to [him]."  Id. at 147.

This court disposed of the underlying issue in Claim #18, above, finding that habeas relief was not warranted under § 2254(d)(1) or § 2254(d)(2).  See Claim #18, supra.  Any objection on this issue made by Hall's trial counsel would have been

baseless.  Accordingly, Hall has not met his burden under <u>Strickland</u> of proving

deficient performance and this court declines to grant habeas relief on this claim.

### CLAIM #28:  ALLEGATION THAT TRIAL COUNSELS' FAILURE TO OBJECT TO ERRORS AT TRIAL AND AT HIS FIRST APPELLATE REVIEW PREJUDICED HALL BY SUBJECTING HIS CLAIMS TO A HIGHER STANDARD OF REVIEW ON APPEAL

Hall argues that defense counsels' performance was deficient for failing to

raise all of Hall's claims in a timely manner so that they could be reviewed as

reversible error rather than under the plain error standard.  (Doc. 1, p. 167).

Specifically, Hall asserts that seven issues were reviewed by the Alabama Court of

Criminal Appeals under a plain error standard because Hall's counsel did not object

at trial, while another sixteen issues were reviewed under a plain error standard by

the Alabama Supreme Court because they were not raised in Hall's direct appeal

brief to the Court of Criminal Appeals.  <u>Id.</u> at 170-71.  According to Hall, trial

counsels' failure to object at trial and, later, to raise the subject questions on direct

appeal, subjected him to a more onerous standard of review on appeal, thereby

prejudicing his ability to obtain appellate relief.  <u>Id.</u> at 168-69.

The state contends that this claim is procedurally defaulted because the Rule

32 circuit court dismissed it for failure to comply with the specificity and full factual

pleading requirements of Rule 32.3 and 32.6(b) of the Alabama Rules of Criminal

Procedure.  (Doc. 13, p. 223).  The Alabama Court of Criminal Appeals subsequently

affirmed the Rule 32 circuit court's ruling on this point.  <u>Hall</u>, 2007 WL 866652,

*44-45 (Ala.Crim.App. 2007).

This court has already discussed the Eleventh Circuit's ruling in <u>Borden</u>, 646 F.3d 816, <u>supra</u>, which holds that claims dismissed by a state court pursuant to Rule 32.6(b) of the Alabama Rules of Criminal Procedure have in fact been considered on the merits.  <u>See</u> Claim # 20 A, Claim # 20 B(2), and Claim #20 D(2), <u>supra</u>.  Thus, this court is not precluded from considering Hall's claim on the merits, subject to the standards of AEDPA.  <u>See</u> <u>Powell</u>, 602 F.3d at 1273.

Although Hall discusses the plain error standard generally in his habeas claim, when it comes to the specifics of his own case, Hall merely lists the issues which the state courts reviewed for plain error.  <u>See</u> Doc. 1, pp. 167-73.  Hall does not discuss the reasonableness or unreasonableness of his trial counsels' decisions in not objecting and not raising certain issues on direct appeal – reasonableness being the key factor that a reviewing court must judge when considering the deficient performance prong of a claim of ineffective assistance of counsel. <u>Strickland</u>, 466 U.S. at 688 (" …the defendant must show that counsel's representation fell below an objective standard of reasonableness." <u>Strickland</u> requires that the defendant affirmatively prove prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 693.  Hall has failed to meet this requirement, for the reasons noted by the Rule 32 circuit court:

> [Hall] does not explain how the outcome of his case would have been affected if those claims had been reviewed under a different standard.  In addition, he does not explain how the outcome of his case would have been affected if those claims had been reviewed under a less onerous standard of review on appeal, as is required by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).

Hall, 979 So.2d at 175 (quoting Trial Transcript Vol. 56, pp. 645-47).

Accordingly, this court finds that Hall has failed to make the requisite Strickland showing.  Therefore, his habeas petition is denied with regard to this issue.

**B.      PROCEDURALLY DEFAULTED CLAIMS**

      **(1)      CLAIMS NOT RAISED ON DIRECT APPEAL (#21, #22, #24, #25, #26, #27, #29, #30, #31, #32, #33, #34, #35, #36, #37, #38, #39, #40)**

In Claim #21, Hall asserts that the trial court permitted the prosecutor to make inconsistent arguments at the respective trials of Hall and his co-defendant, Wayne Travis, and cites Green v. Georgia, 442 U.S. 95 (1979), for the proposition that a court must allow the introduction of evidence that supports a theory that the capital defendant was a lesser participant in the crime.  (Doc. 1, p. 147).

In Claim #22, Hall argues that the Alabama death penalty statute "is constitutionally defective because it does not state what weight the trial court must give the jury's recommendation."  (Doc. 1, p. 147).  Hall also argues in Claim #22 that the jury's death sentence recommendation in the case violated the Eighth Amendment prohibition against the arbitrary infliction of capital punishment because it failed to specify whether the jury found one or more of the statutory aggravating circumstances that were a prerequisite to the imposition of a death sentence.  Id. at 148.

In Claim #24, Hall argues that his ability to obtain a fair trial was affected by the publication of the jury veniremembers' names in the local newspaper on the

same day that the newspaper published an article about Mrs. Haskew's murder. (Doc. 1, pp. 154-55).  In Claim #25, Hall contends that the trial judge violated Hall's constitutional rights and the canons of judicial ethics by failing to recuse himself "after it became patently obvious that he harbored an extraordinary bias against Mr. Hall's counsel."  (Doc. 1, p. 157).

In Claim #26, Hall claims that the Alabama capital sentencing scheme "violates longstanding principles of rights to a jury trial and Due Process" because the jury's sentencing recommendation is not binding upon the judge, who may find statutory aggravating facts supporting a death sentence.  (Doc. 1, p. 162-66).  In Claim #27, Hall asserts that the trial court failed to instruct the jury that it must vote for a sentence of life in prison without parole if they found the aggravating and mitigating circumstances to be equally balanced.  (Doc. 1, p. 166).

In Claim #29, Hall maintains that the trial court erred by admitting evidence of Hall's flight from arrest.[17]  (Doc. 1, pp. 173-74).  In Claim #30, Hall argues that the state failed to carry its burden of proof on the element of intent, and alleges that

---

[17] Although Claim #29 is procedurally defaulted, it bears noting that Hall's recitation of the law on this point is totally incorrect.  Hall asserts that "[c]ourts have long recognized that evidence of flight or related conduct has doubtful probative value as to the issue of guilt or innocence." (Doc. 1, p. 173).  The case that he cites for support, U.S. v. Borders, 693 F.2d 1318, 1324 (11th Cir. 1982) states the exact opposite thing: "Courts have long rejected the argument that evidence of flight is inherently unreliable.  Over three quarters of a century ago, the Supreme Court announced that 'the law is entirely well settled that the flight of the accused is competent evidence against him as having a tendency to establish his guilt.' Allen v. United States, 164 U.S. 492, 499 (1896).  We have on numerous occasions affirmed the validity of our statement in United States v. Ballard, 423 F.2d 127, 133 (5th Cir. 1970) (quoting Wigmore) that: '[I]t is today universally conceded that the fact of an accused's flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.' " (string citation omitted).

the state presented no direct evidence linking him to the murder of Mrs. Haskew. (Doc. 1, p. 174).  In Claim #32, Hall asserts that the trial court erred by denying his motions to conduct individual, sequestered voir dire.  (Doc. 1, pp. 176-77).  In Claim #33, Hall asserts that African-American people, young adults, and women were systematically underrepresented in the grand and petit jury pools, and that the trial court erred in denying his motion to quash the indictment, which argued this point.  (Doc. 1, pp. 177).

In Claim #34, Hall contends that the trial court erroneously denied his motion to visit and examine the crime scene, "to properly explain the situation to his attorneys …" thus violating his constitutional rights.  (Doc. 1, p. 178-79).  In Claim #35, Hall asserts that the trial court erred by permitting what Hall describes as "victim impact testimony" during the guilt phase of trial, which he claims was "simply an attempt by the State to insert an emotional component into an endeavor which requires the utmost emotional detachment."  Id. at 180-81.   In Claim #36, Hall argues that the trial judge referred to the jury's penalty-phase verdict as a "recommendation" at least ten times during his charge to the jury, which had the effect of downplaying and minimizing the jury's role in the sentencing process.  Id. at 182.  Hall claims that this violates Caldwell v. Mississippi, 472 U.S. 320, 341 (1985), in which the U.S. Supreme Court held that it violates the U.S. Constitution to "rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for the appropriateness of the defendant's death rests elsewhere."

In Claim #37, Hall contends that the trial court improperly granted several of the state's challenges of jurors for cause when prospective jurors expressed general objections to the death penalty.  (Doc. 1, p. 183).  In Claim #38, Hall argues that the admission of crime scene photographs and a video that included images of Mrs. Haskew after her death was prejudicial, cumulative, and had no probative value. Id. at 186.

In Claim #39, Hall argues that the trial court erred when it did not find certain statutory mitigating factors to exist, including (i) the mitigating circumstance that "defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor," pursuant to ALA. CODE §13A-5-51(4); the mitigating circumstance that "defendant acted under extreme duress or under the substantial domination of another person," pursuant to ALA. CODE §13A-5-51(5); and the mitigating circumstance that "[t]he capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired." pursuant to ALA. CODE §13A-5-51(6).  (Doc. 1, pp. 188-91).   Hall also claims in Claim #39 that the trial court erred by finding the existence of the aggravating circumstance that the crime was heinous, atrocious, or cruel.  Id. at 192.

Finally, in Claim #40, Hall claims that the cumulative effect of the asserted errors put forth in his petition violated his constitutional rights to due process and a fair trial under the United States Constitution.  Id. at 193.

The state contends that these issues are procedurally defaulted because Hall did not raise them on direct appeal, and therefore, the claims were not fully exhausted.  (Doc. 13, p. 202-62).  A review of Hall's direct appeal brief confirms that Hall did not raise these claims before the Alabama Court of Criminal Appeals.  See Trial Transcript Vol. 49, Tab R-40.  Therefore, the state courts have not had a full and fair opportunity to decide the claims and Hall is procedurally barred by exhaustion principles from pursuing them here.  See, e.g., Mancill v. Hall, 545 F.3d 935, 939 (11th Cir. 2008) (explaining that the habeas exhaustion requirement "is not satisfied if the petitioner fails to present his claims to the state's highest court," and that "[s]uch a failure to exhaust can result in a procedural default that bars a federal court from hearing that claim").

### C.     CLAIMS NOT COGNIZABLE IN A HABEAS CORPUS PETITION

**CLAIM #31:**          **LETHAL INJECTION CONSTITUTES CRUEL AND  UNUSUAL PUNISHMENT**

In Claim #31, Hall claims that lethal injection, which is the manner of execution used by the State of Alabama, constitutes cruel and unusual punishment in violation of the Eighth Amendment.  (Doc. 1, p. 175).  The State argues that this claim is procedurally defaulted because Hall did not raise this claim at trial, upon direct appeal, or in his Rule 32 petition.  (Doc. 13, p. 235).

Both sides overlook the fact that this claim for relief is not cognizable in a habeas petition, but instead must be pursued in the context of a § 1983 civil rights cause of action.  The Eleventh Circuit has expressly stated that "[a] § 1983 lawsuit,

138

not a habeas proceeding, is the proper way to challenge lethal injection procedures."

Tompkins v. Secretary, Dep't of Corrections, 557 F.3d 1257, 1261 (11th Cir. 2009).[18]

Additionally, there exists a considerable body of law that has developed in Eleventh

Circuit in recent years concerning the interplay between § 2254 petitions and

§ 1983 complaints.  The law of this Circuit leaves no doubt that a § 2254 petition for

habeas corpus and a § 1983 complaint "are mutually exclusive: if a claim can be

raised in a federal habeas petition, the same claim cannot be raised in a separate

§ 1983 civil rights action."  Hutcherson v. Riley, 468 F.3d 750, 754 (11th Cir. 2006)

(citation omitted); see also Miller v. Nix, 2009 WL 2959684, *1 (11th Cir. Sept. 17,

2009) ("Because habeas and civil rights actions are mutually exclusive, … the

district court did not err by determining that Miller's claims cannot be brought in a

petition for a writ of habeas corpus.").  The Eleventh Circuit routinely recognizes

method-of-execution claims as being proper in the § 1983 context.  See, e.g.,

DeYoung v. Owens, 646 F.3d 1319, 1325-27 (11th Cir. 2011) (considering on the

merits death row inmate's Eighth Amendment challenge under § 1983 to the

method of execution).  If § 2254 and § 1983 are "mutually exclusive" remedies, and if

---

[18]     See also Rachal v. Quarterman, 2008 WL 410696, *4 (5th Cir. Feb. 14, 2008)
("Claims challenging the method of execution cannot be raised in a habeas proceeding because
they do not concern the fact or duration of a sentence. … This challenge sounds in civil rights,
not habeas."); Lucas v. Upton, 2011 WL 4526754, *5 (M.D. Ga. Sept. 28, 2011) ("A habeas
action is not the appropriate vehicle for attacking Georgia's lethal injection procedures; rather,
that challenge must be brought in a 42 U.S.C. § 1983 action.");  Rhodes v. Secretary, Dep't of
Corrections, 2010 WL 3819358, *57 (M.D. Fla. Sept. 30, 2010) (Eighth Amendment challenge
to method of execution "properly can be brought only under 42 U.S.C. § 1983 and the Prison
Litigation Reform Act, not in this habeas proceeding") (citation omitted); Hertz v. McNeil, 2009
WL 3161813, *35 (N.D. Fla. Sept. 25, 2009) (similar).

method-of-execution challenges are properly raised in § 1983 actions, then logic dictates that they cannot be presented in the form of a § 2254 Petition, as Hall has done here.

More generally, Hall's argument both in his petition and in his reply brief overlooks the overarching principle that "[f]ederal habeas corpus law exists to provide a prisoner an avenue to attack the fact or duration of physical imprisonment and to obtain immediate or speedier release." Valle v. Secretary, Florida Dep't of Corrections, 654 F.3d 1266, 1267 (11th Cir. 2011).  By contrast, "[w]hen an inmate challenges the circumstances of his confinement but not the validity of his conviction and/or sentence, then the claim is properly raised in a civil rights action under § 1983." Hutcherson, 468 F.3d at 754.  In challenging Alabama's method of execution (and arguing that such a method bears an unreasonable risk of causing him severe pain), Hall is not attacking the fact or duration of his physical imprisonment by the State of Alabama, and is not requesting immediate or speedier release.  Rather, he is challenging the means by which the State means to execute him, which is plainly a circumstance of his confinement.  As such, under both Tompkins and the Hutcherson line of authorities, Hall may bring his Eighth Amendment challenge to Alabama's method of execution only in a § 1983 complaint.  Because a habeas corpus petition is an improper vehicle for pursuing such a claim, this ground for relief is denied.

D.    MOOT CLAIMS

CLAIM #23:  PROSECUTION'S ELIMINATION OF QUALIFIED JURY
MEMBERS ON THE BASIS OF RACE

In light of the court's findings with regard to Claim #1, supra, Hall's

allegation that the prosecution engaged in racial discrimination of African-

American venire members is moot.

IV.    CONCLUSION

As a result, it is hereby **ORDERED** that Hall's petition (Doc. 1) for a writ of

habeas corpus shall be **CONDITIONALLY GRANTED**.  This conditional writ

shall become unconditional and permanent unless the State of Alabama commences

further proceedings within 240 days of the date of this order to afford the petitioner

a new trial.  See Stephens v. Haley, 2011 WL 4701769, *20 (S.D. Ala. 2011)

(allowing the State of Alabama to commence further proceedings within 240 days).

**DONE** and **ORDERED** this 30th day of September, 2013.

/s/  Callie V.S. Granade
**UNITED STATES DISTRICT JUDGE**